Heinz Binder (SBN 87908)
Wendy W. Smith (SBN 133887)
Binder & Malter, LLP
2775 Park Avenue
Santa Clara, CA 95050
T: (408) 295-1700
F: (408) 295-1531
Email: Heinz@bindermalter.com
Email: Wendy@bindermalter.com

Ivo Keller (SBN 245909)
Brent D. Meyer (SBN 266152)
SSL LAW FIRM LLP
505 Montgomery Street, Suite 620
San Francisco, CA 94111
Telephone: (415) 814-6400
Facsimile:  (415) 814-6401
Email: ivo@ssllawfirm.com
Email: bmeyer@ssllawfirm.com

Attorneys for Creditors
Carr & Ferrell LLP and Ezio Valdevit

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

| | |
|---|---|
| In re:<br><br>Creagri, Inc.<br><br>        Debtor.<br><br>Carr & Ferrell, LLP, and Ezio Valdevit,<br><br>        Plaintiffs,<br><br>v.<br><br>Dr. Roberto Crea, an individual, also known as Dr. Robert Crea; Caliscana, LLC, a California Limited Liability Company; Oliphenol, LLC, a Delaware Limited Liability Company; 2199933 Ontario Inc., a Canadian Corporation; and DOES 1-20,<br><br>        Defendants. | Case No.  4:20-bk-41289-CN<br><br>Chapter 7<br><br>**COMPLAINT FOR FRAUDULENT TRANSFERS, VIOLATIONS OF CALIFORNIA UNIFORM VOIDABLE TRANSACTIONS ACT, BREACH OF FIDUCIARY DUTY, BREACH OF CONTRACT, AND UNFAIR BUSINESS PRACTICES** |

Ezio Valdevit ("Valdevit") and Carr & Ferrell LLP ("Carr & Ferrell" and, with Valdevit, collectively, "Plaintiffs"), have purchased the right to pursue certain claims against Dr. Roberto Crea and the other defendants from the Chapter 7 Bankruptcy estate referenced in the caption above. Plaintiffs are initiating this action to recover certain assets received by defendants, or their value, for application against Plaintiffs' claims and for the benefit of the bankruptcy estate.

## PARTIES

1.      Creagri, Inc. ("Creagri" or the "Debtor") is a California corporation and is the Debtor in the above-referenced bankruptcy case (the "Bankruptcy Case").

2.      Valdevit is an individual residing in California, is a creditor of the Debtor, and filed a proof of claim in the Bankruptcy Case on June 30, 2021 for $3,208,488.58.

3.      Carr & Ferrell is a limited liability partnership established in the State of California, is a creditor of the Debtor, and filed a proof of claim in the Bankruptcy Case on May 12, 2021 for $878,986.47.

4.      Plaintiffs acquired from the Chapter 7 Trustee of the Debtor's bankruptcy estate (the "Estate") all of the Estate's right, title, and interest in any and all claims of any kind that the Estate has or may have against Dr. Crea (defined below), any person or entity related to Dr. Crea, or in which Dr. Crea has an interest, and any person or entity to whom or which any of the Debtor's assets were transferred either before or after the Debtor filed its bankruptcy petition on August 3, 2020. The purchased claims acquired include, but are not limited to, claims under 11 U.S.C. §§ 544, 547, 548, and 549, and any other claims that may exist under federal or state law.

5.      Plaintiffs are informed and believe, and thereon allege, the Debtor is currently suspended by the California Secretary of State.

6.      Dr. Roberto Crea ("Dr. Crea") is an individual. Plaintiffs are informed and believe, and thereon allege, that Dr. Crea resided in the State of California at the time all of the events alleged below occurred, and that he has sometimes used the name Dr. Robert Crea.  As of date of filing this action, Dr. Crea is the Debtor's responsible individual in the Bankruptcy Case. At all times relevant to this action, Dr. Crea held a controlling interest in the shares of Creagri.

7.      Caliscana, LLC ("Caliscana") is a limited liability company established in the State of

Case: 21-04040   Doc# 1   Filed: 11/08/21   Entered: 11/08/21 15:40:46   Page 2 of 121

California in 2019. Plaintiffs are informed and believe, and thereon allege, that Caliscana is currently suspended by the California Secretary of State, and that at all times relevant to this action, Dr. Crea was and continues to be the sole manager and member of Caliscana.

8. Oliphenol, LLC ("Oliphenol") is a limited liability company established in the State of Delaware and is registered as a foreign limited liability company with the Secretary of State of the State of California. Plaintiffs are informed and believe, and thereon allege, that at all times relevant to this action, Dr. Crea was and continues to be the Chief Executive Officer, Chief Science Officer, and a major Member of Oliphenol.

9. Plaintiffs are informed and believe, and thereon allege, that 2199933 Ontario Inc. ("Ontario Inc.") is a corporation organized under the laws of the Province of Ontario, Canada. Plaintiffs are informed and believe, and thereon allege, that Ontario, Inc. is an affiliate of Oliphenol.

10. Plaintiffs do not know the true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 20, inclusive, and therefore sue said Defendants under fictional names. Plaintiffs allege, upon information and belief, that each fictionally named Defendant has participated directly or indirectly in the wrongful acts herein alleged or obtained an interest in the property Plaintiffs seek to recover. Plaintiffs will amend this Complaint to show their true names and capacities if and when the identities of said persons become known to them. All of the named Defendants and DOES 1 through 20 are herein collectively referred to as "Defendants."

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this proceeding pursuant to 28 U.S.C. §1334.

12. Venue is proper before this Court pursuant to 28 U.S.C. §1409(a) by virtue of the above-referenced Bankruptcy Case pending before the United States Bankruptcy Court for the Northern District of California, Oakland Division.

13. Creagri filed for bankruptcy under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code") on August 3, 2020.

14. This Complaint is filed pursuant to Fed. R. Bank. Proc. 7001(1), (2), (7) and (9).

15. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §157(b)(2) (A),

Case: 21-04040   Doc# 1   Filed: 11/08/21   Entered: 11/08/21 15:40:46   Page 3 of 121

(E), (F), (H), (K) and (O).

16.     The claims for relief are brought under the provisions of the Bankruptcy Code and applicable state law.  The Bankruptcy Court has jurisdiction to enter final orders and judgments as to the claims under the Bankruptcy Code, and Plaintiffs consent to entry by this Court of final orders and judgments regarding all of their claims for relief.

## BACKGROUND FACTS

17.     After the filing of the Bankruptcy Case, the Chapter 7 Trustee took extensive testimony from the Debtor's responsible individual, Dr. Crea, and obtained documents from Dr. Crea on behalf of the Debtor.  Carr & Ferrell also conducted a Rule 2004 examination of Dr. Crea.  Many of the allegations below are based on documents and testimony provided during that process, collectively referred to herein as the "Debtor's Information."

### Corporate Formation and 2004 & 2008 Investments

18.     Based upon the Debtor's Information, Creagri was formed originally as a limited liability company and subsequently converted to a corporation.  The company's business purpose was to develop olive oil-based health products for sale to distributors and consumers.

19.     The Debtor's Information shows that in 2002, Creagri sought venture capital investment and obtained a commitment of approximately $6.3 million from third-party venture capital funds, among others. Certain independent investors (the "Investors") invested approximately $5 million in Creagri in exchange for certain preferred stock ("Preferred Shares").  As a condition for their investment (the "2002 Investment"), the Investors required that Dr. Crea cancel certain promissory notes he held from Creagri and take a larger equity interest in Creagri instead.

20.     The Debtor's Information further shows that in 2004, Creagri sought additional investment from the Investors. To facilitate such investment, Creagri issued $2 million in convertible promissory notes (the "2004 Bridge Notes").  The Debtor's Information shows that approximately $530,000 of the 2004 Bridge Notes were issued to Dr. Crea, as note holder, and the remainder were issued to certain of the Investors.

21.     The 2004 Bridge Notes are substantially identical, are dated February 15, 2004, and were due to be paid July 31, 2004.  The 2004 Bridge Notes were convertible to shares in the company upon

certain qualifying events, which events never occurred.

22. The 2004 Bridge Notes are executed on behalf of Creagri by Dr. Crea, and Dr. Crea testified that he was CEO and a member of the Board of Directors of Creagri at the time he executed them.

23. Plaintiffs are informed and believe, and thereon allege, that at the time Dr. Crea executed the 2004 Bridge Notes on behalf of Creagri, he had no reason to believe that the company would be able to pay the notes when they were due. Plaintiffs are informed and believe, and thereon allege, that the Investors had no reason to believe that Creagri would be able to pay the 2004 Bridge Notes when they became due, either.

24. Based on the Debtor's Information, the 2004 Bridge Notes were not secured, and all of the purported lenders for the 2004 Bridge Notes were shareholders of Creagri. No part of the 2004 Bridge Notes were paid by Creagri or any other party. Accordingly, although the transactions evidenced by the 2004 Bridge Notes were styled as loans, they were, in fact, further capital investments in Creagri by Dr. Crea and the Investors.

25. Based on the Debtor's Information, in 2008 Creagri entered into a second "bridge" financing by issuing convertible promissory notes to certain of the Investors (the "2008 Bridge Notes"). The Debtor's Information again shows that all of the lenders for the 2008 Bridge Notes were shareholders of Creagri. The 2008 Bridge Notes are substantially identical, were issued on May 1, 2008, and were due December 31, 2008. Attached hereto as <u>Exhibit A</u> is a true and correct copy of one of the 2008 Bridge Notes that was produced by Dr. Crea.

26. The 2008 Bridge Notes were again signed by Dr. Crea on behalf of Creagri. Plaintiffs are informed and believe, and thereon allege, that Dr. Crea had no reason to believe Creagri would be able to pay the 2008 Bridge Notes when they were due, or at any other time.

27. Based on the Debtor's Information, the total face value of the 2008 Bridge Notes was $985,331.10. Of that amount, approximately $425,000 in value was attributed to notes held by entities owned and controlled by Dr. Crea. Attached hereto as <u>Exhibit B</u> is a true and correct copy of a spreadsheet provided by Dr. Crea which, according to the Debtor's Information, reflects an accurate allocation of the 2004 Bridge Notes and the 2008 Bridge Notes.

28. Based on the Debtor's Information, although the 2008 Bridge Notes are described as "secured," no security agreement for said notes was signed.

29. According to the Debtor's Information, none of the 2008 Bridge Notes were paid when due by Creagri or any other party, and no action was taken by any party to enforce the 2008 Bridge Notes. Accordingly, although the 2008 Bridge Notes were styled as loans, they were, in fact, further capital investments in Creagri by Dr. Crea and the Investors.

### Dr. Crea's Buyout Of The Investors

30. Based on the Debtor's Information, in April of 2009 Dr. Crea entered into a series of agreements to acquire all of the Investors' interests in the 2004 Bridge Notes, the 2008 Bridge Notes, and the Preferred Shares (the "2009 Transaction").

31. The Debtor's Information shows that Dr. Crea, individually and through entities owned and controlled by him, paid the Investors approximately $3 million in exchange for transferring the Investors' interests in the 2004 Bridge Notes, the 2008 Bridge Notes, and the Preferred Shares to Dr. Crea.

32. Based on the Debtor's Information, the 2009 Transaction did *not* include any assignment of any security agreements between the Investors and Creagri, or of any liens against Creagri's assets. To the contrary, the Debtor's Information shows that the Investors released all liens against Creagri's assets as part of the 2009 Transaction.

33. Attached hereto as Exhibit C is a true and correct copy of the agreement that documents the 2009 Transaction-- a Stock and Notes Purchase and Sale Agreement--which was provided by Dr. Crea (the "2009 Note and Stock Purchase Agreement"). The 2009 Note and Stock Purchase Agreement contains an express releasee of all of the Investors' liens at Section 6.2.

34. Based on the Debtor's Information, to the extent Dr. Crea or any entity controlled by him acquired the Investors' interests in the 2004 Bridge Notes, the 2008 Bridge Notes, or any other interests held by the Investors, such acquisition was unsecured by any asset of Creagri.

35. Pursuant to the 2009 Note and Stock Purchase Agreement, the purchase price for the promissory notes and preferred shares held by the Investors was allocated as follows:

| | |
|---|---|
| Preferred shares: | $1,617,000 |
| 2004 Bridge Notes: | $473,548 |
| 2008 Bridge Notes: | $909,280 |

36. The Debtor's Information shows that as of the time of the 2009 Transaction, the 2004 Bridge Notes had already been in default for several years and remained unpaid, and the 2008 Bridge Notes had been in default since December 31, 2008 and remained unpaid.

37. Based on the Debtor's Information, at no time within four years after either of the default dates or the date of the 2009 Transaction, did Dr. Crea attempt to collect on either the 2004 Bridge Notes or the 2008 Bridge Notes, and there is no written acknowledgement of the debt or tolling agreement during that time.

### The 2019 Transaction

38. Based on the Debtor's Information, between December 2018 and January 2019, Creagri, Dr. Crea, Caliscana, Oliphenol, and Ontario Inc. entered into a multi-part agreement that resulted in Oliphenol acquiring all the assets of Creagri without any of its liabilities, and without payment to any of Creagri's creditors except Dr. Crea (the "2019 Transaction"). The 2019 Transaction had at least four components:

39. First, Dr. Crea arranged for Creagri to sell all of its assets to himself, in his personal capacity, without taking on any of its liabilities. That transfer was evidenced by a document entitled Sale of Assets to Secured Creditor dated as of December 17, 2018 (the "Creagri Sale Agreement").

40. Under the Creagri Sale Agreement, Creagri purported to sell, convey, assign, transfer and deliver to Dr. Crea all of Creagri's right, title and interest in and to, among other things, all of Creagri's tangible personal property; data and records; patents, trademarks and copyrights; and other intellectual property rights (collectively, the "Creagri Assets"). A true and correct copy of the Creagri Sale Agreement which was provided by the Debtor is attached hereto as Exhibit D.

41. The only purported consideration to Creagri provided for in the Creagri Sale Agreement was the cancellation of the 2008 Bridge Notes which, in light of the 2009 Transaction, were held by Dr. Crea himself. Based on the Debtor's Information, the other creditors of Creagri received no consideration of any kind.

42.     Second, the Debtor's Information shows that Dr. Crea purported to transfer all of his interest in the Creagri Assets to an entity he formed to hold the assets, Caliscana. That transfer was documented in an Assignment dated as of January 15, 2019 and a Transfer dated January 7, 2019 (collectively, the "Caliscana Transfer Documents"), copies of which Plaintiffs obtained from the Debtor. True and correct copies of the Caliscana Transfer Documents are attached hereto as Exhibit E.

43.     The Caliscana Transfer Documents both state that the transfer of the Creagri Assets to Caliscana was "for good and valuable consideration," but neither document specifies what consideration (if any) was provided. Plaintiffs are informed and believe, and thereon allege, that there was no consideration for this transfer, and that Dr. Crea used his wholly-owned company Caliscana for the purpose of transferring the Creagri Assets to impede Creagri's creditors in their pursuit of the assets.

44.     Third, the Debtor's Information shows that Dr. Crea and two new investors, Raymond Chyc and Steve Stansell, sometimes doing business as James Henry Innovations, formed a new entity, Oliphenol, and gave themselves membership interests in, and appointed themselves as officers of, Oliphenol.

45.     Fourth, Dr. Crea purported to transfer all of the Creagri Assets from Caliscana to Oliphenol. That transfer was documented in an Asset Purchase Agreement dated as of January 21, 2019 (the "Oliphenol Sale Agreement"). A true and correct copy of the Oliphenol Sale Agreement which was provided by Dr. Crea on behalf of the Debtor is attached hereto as Exhibit F.

46.     Based on the Debtor's Information, Dr. Crea, directly and through entities owned and controlled by him, received payment totaling $1,750,000, plus a 40% ownership interest in Oliphenol as a result of the 2019 Transaction. Dr. Crea also became the CEO and CSO of Oliphenol.

47.     The Debtor's Information shows that Creagri received no consideration for the sale of the Creagri Assets other than the alleged forgiveness of the 2008 Bridge Notes held by Dr. Crea himself. Further, Plaintiffs are informed and believe, and thereon allege, that the 2008 Bridge Notes were, in fact, never cancelled.

48.     The Debtor's Information shows that $250,000 of the purchase price in the 2019 Transaction was styled as a "loan" from Ontario Inc. to Dr. Crea personally, which was then "assumed" by Oliphenol and "secured" to Ontario Inc. with a general security interest in all of Oliphenol's assets.

Plaintiffs are informed and believe, and thereon allege, that Ontario Inc. is controlled by insiders of Oliphenol, and that the transfer of the purported security interest in the Creagri Assets to Ontario, Inc. was used solely to create the illusion of a security interest in the Creagri Assets, now held by Oliphenol.

49.    Plaintiffs are informed and believe, and thereon allege, that the purpose of the 2019 Transaction was to transfer all assets of Creagri's business, including the trademarks "OLIVENOL," "OLIVENOL PLUS," and "HIDROX" and all related patents and intellectual property, to continue Creagri's business without paying Creagri's creditors.

50.    Further, Plaintiffs are informed and believe, and thereon allege, that once the 2019 Transaction was complete, Oliphenol began selling product acquired from Creagri to Creagri's customers.

51.    Plaintiffs are informed and believe, and thereon allege, that no shareholder meeting was held in connection with the 2019 Transaction, that Dr. Crea did not inform any of the shareholders of Creagri of the 2019 Transaction before it was completed, and that no bulk-sale notice was given in connection with the 2019 Transaction.

52.    Due to Creagri's failure to pay its debts to Plaintiffs, Plaintiffs have been forced to retain the undersigned counsel, and have incurred legal expenses which are recoverable under several of the legal theories alleged below.

## **FIRST CAUSE OF ACTION**

### **(Fraudulent Transfer Under 11 U.S.C. § 548 Against All Defendants)**

53.    Plaintiffs reallege and incorporate herein by reference each and every allegation set forth above in Paragraphs 1 through 52.

54.    The 2019 Transaction was a transfer of an interest of the Debtor in property – namely, the Creagri Assets.

55.    The 2019 Transaction occurred within 2 years of the filing of the petition initiating the Bankruptcy Case.

56.    Plaintiffs are informed and believe and thereon allege that the 2019 Transaction was made by each Defendant with the intent to defraud Creagri's creditors by transferring all of the Creagri Assets to a new company without compensation to any of Creagri's creditors and with only Defendants

Case: 21-04040    Doc# 1    Filed: 11/08/21    Entered: 11/08/21 15:40:46    Page 9 of 121

1    benefitting from the transaction.

2    57.    Creagri received less than a reasonably equivalent value in exchange for the Creagri Assets

3    because the 2008 Bridge Notes held by Dr. Crea, which were purportedly cancelled as part of the

4    transaction, were not secured by a security interest in any of Creagri's property, had been in default well

5    beyond the limitations period for an enforcement action, and were not actually cancelled as part of the

6    2019 Transaction.

7    58.    Plaintiffs are informed and believe and thereon allege, that Creagri was insolvent at the

8    time, or became insolvent, as a result of the 2019 Transaction because the transaction left Creagri with no

9    assets and several million dollars in debt.

10   WHEREFORE, Plaintiffs respectfully request the relief hereinafter set forth.

11   ## SECOND CAUSE OF ACTION

12   **(Violations of California Uniform Voidable Transactions Act, Cal. Civil Code §§ 3439 *et seq.*,**

13   **Against All Defendants)**

14   59.    Plaintiffs reallege and incorporate herein by reference each and every allegation set forth

15   above in Paragraphs 1 through 58.

16   60.    At the time of the 2019 Transaction, and at all times thereafter, Plaintiffs have had a right to

17   payment from Creagri, as follows:

18   a.    Valdevit had a right to payment as the holder of 17 promissory notes executed by

19   Creagri between September 29, 2010, and February 1, 2015 (the "Valdevit Notes"). Each of the

20   Valdevit Notes was due and payable in full upon Valdevit's demand. Valdevit made a demand for

21   payment on December 22, 2017, less than six years before the Bankruptcy Case was filed. The

22   Valdevit Notes therefore remain enforceable obligations of the Debtor.

23   b.    Creagri owed Carr & Ferrell money for legal services rendered, for which Creagri

24   was responsible under a written agreement with Carr & Ferrell (the "Carr & Ferrell Engagement

25   Letter"), and which Creagri failed to pay within four years of the filing of the Bankruptcy Case.

26   61.    Plaintiffs are informed and believe, and thereon allege, that in the 2019 Transaction the

27   Defendants transferred the Creagri Assets with the intent to defraud Valdevit, Carr & Ferrell, and

28   Creagri's other creditors. The factors showing fraudulent intent based on the Debtor's Information

include the following:

a. The Creagri Assets were transferred to an insider of Creagri – namely, Dr. Crea;

b. No shareholder meeting of Creagri was held in connection with the 2019 Transaction, and Dr. Crea did not inform any of the shareholders of Creagri of the 2019 Transaction before it was completed;

c. Before the 2019 Transaction, Creagri had been sued and a judgment had been obtained against it;

d. The 2019 Transaction involved a transfer of substantially all of Creagri's assets;

e. Creagri received no consideration for the sale of the Creagri Assets because the promissory notes that were purportedly cancelled as part of the sale were unenforceable and unsecured, and were not actually cancelled in the 2019 Transaction;

f. Creagri was insolvent at the time of the 2019 transaction, or became insolvent due to the 2019 Transaction, as evidenced by Creagri's lack of assets and significant debt and the filing of the Bankruptcy Case after the transaction; and

g. The 2019 Transaction occurred shortly before a large payment was due from Creagri to one of its former landlords as a result of Creagri's defaults under a lease.

62. Plaintiffs were injured as a result of the 2019 Transaction because the transaction resulted in the loss of substantially all of Creagri's Assets without any payment to Creagri or its creditors, including Plaintiffs.

63. Plaintiffs are informed and believe, and thereon allege, that had the 2019 Transaction never occurred, Creagri could have repaid some or all of its debts to Plaintiffs. The Creagri Assets had value, as evidenced by the new third-party investors' payment of $1,750,000 to Dr. Crea as part of the 2019 Transaction. The 2019 Transaction was therefore a substantial factor causing the injuries to Plaintiffs.

WHEREFORE, Plaintiffs respectfully request the relief hereinafter set forth.

## THIRD CAUSE OF ACTION

### (Breach of Fiduciary Duty Under Cal. Corps. Code § 309 Against Dr. Crea)

64. Plaintiffs reallege and incorporate herein by reference each and every allegation set forth above in Paragraphs 1 through 63.

65.     Dr. Crea owed fiduciary duties to Creagri and its shareholders by virtue of his status as the CEO, Director, and controlling shareholder of Creagri.

66.     Plaintiffs are informed and believe, and thereon allege, that Dr. Crea entered into the 2019 Transaction solely for his own benefit and not for the benefit of Creagri.

67.     Dr. Crea breached his fiduciary duties to Creagri by causing Creagri to sell substantially all of its assets in the 2019 Transaction without any compensation to Creagri, and by retaining the amount he received from Oliphenol and Ontario, Inc. in exchange for the Creagri Assets.

68.     Plaintiffs are informed and believe, and thereon allege, that had the 2019 Transaction never occurred, Creagri could have sold the Creagri Assets for an amount resulting in compensation to Creagri, and could have repaid some or all of its debts to Plaintiffs.  The Creagri Assets had value, as evidenced by the new third-party investors' payment of $1,750,000 to Dr. Crea as part of the 2019 Transaction.

69.     Plaintiffs purchased the right to pursue this action against Dr. Crea on behalf of the Debtor and the Estate, which will be entitled to a portion of any amount recovered as set forth the in the order of the Bankruptcy Court approving the purchase by Plaintiffs.

WHEREFORE, Plaintiffs respectfully request the relief hereinafter set forth.

## FOURTH CAUSE OF ACTION

### (Breach of Contract/Successor Liability Against Oliphenol)

70.     Plaintiffs reallege and incorporate herein by reference each and every allegation set forth above in Paragraphs 1 through 69.

71.     Creagri breached its contracts with Valdevit as follows:

a.     Creagri entered into contracts with Valdevit in the form of the Valdevit Notes.

b.     Valdevit fully performed all of his obligations under the Valdevit Notes.  Among other things, Valdevit loaned the money required under the Valdevit Notes to Creagri, and made a demand for payment under the Valdevit Notes in accordance with the instruments' express terms.

c.     Creagri failed to perform its obligations under the Valdevit Notes by failing to pay to Valdevit all principal and accrued interest thereunder on the date of Valdevit's demand for payment.

d.     Valdevit was harmed by Creagri's failure to pay the amounts due under the

Valdevit Notes because at least $3,208,488.58 was due and payable under the Valdevit Notes as of June 30, 2021, and interest continues to accrue.

 e. Creagri's breach of contract was a substantial factor in causing Valdevit's harm because Creagri was liable under the Valdevit Notes and failed to repay the Valdevit Notes.

72. Creagri breached its contracts with Carr & Ferrell as follows:

 a. Creagri entered into a contract with Carr & Ferrell in the form of the Carr & Ferrell Engagement Letter.

 b. Carr & Ferrell fully performed all of its obligations under the Carr & Ferrell Engagement Letter. Among other things, Carr & Ferrell performed all legal services required of it under the Carr & Ferrell Engagement Letter.

 c. Creagri failed to perform its obligations under the Carr & Ferrell Engagement Letter by failing to pay the invoices issued by Carr & Ferrell for legal services performed and costs incurred on behalf of Creagri.

 d. Carr & Ferrell was harmed by Creagri's failure to pay the amounts due under the Carr & Ferrell Engagement Letter because at least $878,986.47 was due and payable under the Carr & Ferrell Engagement Letter as of May 12, 2021, and interest continues to accrue.

 e. Creagri's breach of contract was a substantial factor in causing Carr & Ferrell's harm because Creagri was liable under the Carr & Ferrell Engagement Letter and failed to pay the amounts due thereunder.

73. Oliphenol is liable for the debts of Creagri under the doctrine of successor liability for at least three reasons. First, based on the Debtor's Information, Oliphenol is merely a continuation of Creagri because no adequate consideration was given to Creagri in exchange for the Creagri Assets in the 2019 Transaction, and because Dr. Crea was the CEO, a director, and the majority shareholder of Creagri and is the CEO, CSO, and owner of a 40% membership interest in Oliphenol.

74. Second, Plaintiffs are informed and believe, and thereon allege, that the 2019 Transaction was entered into fraudulently to escape liability for Creagri's debts, because the 2019 Transaction allowed Oliphenol to assume all of the assets and continue the business of Creagri without paying Creagri any compensation and without expressly assuming Creagri's debts.

75.     Third, Plaintiffs are informed and believes, and thereon allege, that Oliphenol has assumed and continued to use the names, products, formulas, proprietary information, trademarks, customer lists and suppliers of Creagri without payment.

WHEREFORE, Plaintiffs respectfully request the relief hereinafter set forth.

### FIFTH CAUSE OF ACTION

**(Unfair Business Practices Under Cal. Bus. & Profs. Code § 17200 Against All Defendants)**

76.     Plaintiffs reallege and incorporate herein by reference each and every allegation set forth above in Paragraphs 1 through 75.

77.     The Defendants committed acts that are unlawful in the completion of the 2019 Transaction because the transaction violated various laws including, without limitation, 11 U.S.C. § 548, Cal. Civil Code §§ 3439 *et seq.*, and Cal. Corps. Code § 309.

78.     Plaintiffs suffered injuries in fact and loss of money due to the 2019 Transaction because the transaction resulted in the loss of substantially all of Creagri's Assets without any payment to Creagri or its creditors at a time when Creagri owned money to the Plaintiffs.

WHEREFORE, Plaintiffs respectfully request the relief hereinafter set forth.

### PRAYER

WHEREFORE, Plaintiffs pray for relief as set forth below:

As to the First and Second Causes of Action against all Defendants:

1.     Avoidance of the 2019 Transaction and recovery from each of the Defendants of the Creagri Assets received by that Defendant;

2.     Restitution of the value of the Creagri Assets at the time of the 2019 Transaction, or such higher value as may be required to avoid injustice, and all profits derived from use of the Creagri Assets since the 2019 Transaction;

3.     A constructive trust over the Creagri Assets and all proceeds derived therefrom;

4.     A temporary and permanent injunction prohibiting the Defendants from further transferring the Creagri Assets and any proceeds derived therefrom, except in accordance with an order of this Court;

5.     An award of money damages in an amount to be determined and according to proof, together with interest thereon to the date the judgment is satisfied;

As to the Third Cause of Action against Dr. Crea:

6.      Direct and consequential damages resulting from Dr. Crea's breach of fiduciary duty in an amount to be proved;

As to the Fourth Cause of Action against Oliphenol

7.      Damages in the amount of all of the outstanding claims against the Debtor;

As to the Fifth Cause of Action against all Defendants

8.      Direct damages in an amount to be proved;

As to all Causes of Action against all Defendants:

9.      An award of Plaintiffs' reasonable costs, disbursements, and attorneys' and expert fees; and

10.     Such further relief as the Court deems proper.


Dated: November 3, 2021                    BINDER & MALTER LLP


                                           _____/s/Wendy W. Smith_____
                                           Wendy W. Smith, Attorneys Creditor
                                           Carr & Ferrell LLP

Dated: November 3, 2021                    SSL LAW FIRM LLP


                                           _____/s/Ivo Keller_____
                                           Ivo Keller, Attorneys Creditor
                                           Ezio Valdevit

# EXHIBIT A

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"). IT MAY NOT BE SOLD, OFFERED FOR SALE, PLEDGED, HYPOTHECATED, OR OTHERWISE TRANSFERRED EXCEPT PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND ANY APPLICABLE STATE SECURITIES LAWS OR AN OPINION OF COUNSEL SATISFACTORY TO THE COMPANY THAT REGISTRATION IS NOT REQUIRED UNDER THE ACT OR UNLESS SOLD PURSUANT TO RULE 144 UNDER THE ACT.

## CREAGRI, INC.
### SECURED PROMISSORY NOTE

May 1, 2008                                                          $373,262.99

FOR VALUE RECEIVED, CreAgri, Inc. (the "**Company**") promises to pay to the order of Burrill Nutraceuticals Capital Fund, L.P. or its permitted assigns, transferees and successors as provided herein (the "**Holder**"), or as the Holder may direct, at its offices located at the address of the Holder provided on the signature page hereto or at such other location as the Holder may designate, Three Hundred Seventy-Three Thousand Two Hundred Sixty-Two Dollars and Ninety-Nine Cents ($373,262.99) ("**Principal**"), plus simple interest thereon from the date of this Secured Promissory Note ("**Note**") at an annual interest rate equal to the lower of (i) twelve percent (12%) or (ii) the highest rate permitted by applicable law (the "**Interest Rate**").

Interest on the Principal will be computed on the basis of a year of 360 days for the actual number of days elapsed from the date of this Note. The number of days used to compute the interest will include the first day but exclude the last day during which any principal is outstanding.

1.      *Note; Repayment Preference; Security Agreement.*

1.1     This Note is one of eight (8) Secured Promissory Notes (collectively, the "***Bridge Loan Notes***") issued by the Company on the date of this Note, totaling $985,331.10 in aggregate principal amount, which other Bridge Loan Notes are identical to this Note except as to the Holder thereunder.

1.2     This Note carries a repayment preference equal to fifty percent (50%) of the original Principal amount (the "***Repayment Preference***"). The Repayment Preference will be payable, together with Principal and accrued and unpaid interest hereunder, on the Repayment Date, as defined in Section 2.1 below, and prior to Repayment Date upon the occurrence of an Exit Acquisition or a Liquidation Event, as defined below.

1

Case: 21-04040   Doc# 1   Filed: 11/08/21   Entered: 11/08/21 15:40:46   Page 17 of 121

1.3    This Note and the Company's obligations hereunder are secured pursuant to the provisions of that certain Security Agreement dated May 1, 2008 ("*Security Agreement*"), made by the Company for the benefit of the Holders of the Bridge Loan Notes. Furthermore, the Company, the Holders of the Bridge Loan Notes and certain existing creditors of the Company have entered into that certain Subordination Agreement dated May 1, 2008 ("*Subordination Agreement*").

2.    ***Principal, Repayment Preference and Interest Payments.***

2.1    Subject to Section 4, the entire Principal of this Note together with accrued and unpaid interest thereon and the Repayment Preference will be due and payable on the Repayment Date. "*Repayment Date*" under this Note shall be December 31, 2008, unless the Holders of at least 85% of the principal amount of the Bridge Loan Notes waive such Repayment Date and agree on a later Repayment Date. In no event will the Repayment Date be a date later than March 31, 2009.

2.2    The Principal, interest and Repayment Preference on this Note will be payable in the lawful currency of the United States of America by wire transfer of immediately available funds and without set-off or counterclaim, free and clear of and without deduction for any present or future taxes, restrictions or conditions of any nature.

2.3    All payments under this Note prior to demand or acceleration will be applied first, to any and all costs, expenses, or charges then owed by the Company to the Holder, second, to accrued and unpaid interest, third, to the unpaid Principal balance, and fourth, to the Repayment Preference. All payments so received after demand or acceleration will be applied in such manner as the Holder may determine in its sole and absolute discretion.

2.4    Whenever any payment on this Note is stated to be due on a day which is not a business day, the payment will be made on the next succeeding business day and the extension of time will be included in the computation of the payment of interest of this Note.

2.5    Overdue Principal, interest and Repayment Preference will bear interest at a rate equal to the lower of: (a) two percent (2%) above the then applicable Interest Rate; or (b) the highest rate permitted by applicable law (the "*Default Rate*"). Overdue Principal, Repayment Preference and interest will be payable on demand.

2.6    This Note is subject to the express condition that at no time will the Company be obligated or required to pay interest or Repayment Preference at a rate which could subject the Company or the Holder to either civil or criminal liability as a result of being in excess of the maximum rate which the Company is permitted by law to contract or agree to pay. If, by the terms of this Note, the Company is at any time required or obligated to pay interest or Repayment Preference at a rate in excess of such maximum rate, the rate of interest under this Note will be deemed to be immediately reduced to the maximum rate and interest payable under this Note will be computed at the maximum rate and the portion of all prior interest payments in excess of the

2

maximum rate will be applied and will be deemed to have been payments in reduction of the Principal balance of this Note.

3.     *Prepayment and Repayment*.

3.1     Prior to the Repayment Date, this Note may not be prepaid without the consent of holders of at least 85% of the aggregate Principal of all of the Bridge Loan Notes.

3.2     Any prepayment or repayment on the Bridge Loan Notes shall be made to the Holders, pro rata, on the basis of each Holder's Note and shall be made contemporaneously to each Holder.

4.     *Exit Acquisition or Liquidation Event*.

4.1     *Exit Acquisition or Liquidation Event*.  If any "Exit Acquisition" or "Liquidation Event" occurs after the date of this Note but before the Repayment Date, any amounts due under this Note will become immediately due and payable. The Company will provide the Holder with written notice of the Exit Acquisition at least 10 days prior to the expected closing date of the Exit Acquisition.  An "*Exit Acquisition*" is any one of the following:

(a)     The sale, lease, assignment, transfer, conveyance or disposal of all or substantially all of the assets of the Company.

(b)     The acquisition of the Company by another entity by means of consolidation, corporate reorganizations or merger, sale of assets, or other transaction or series of related transactions in which more than 50% of the outstanding voting power of the Company is disposed of.

For purposes of this Note, a "*Liquidation Event*" is any one of the events described in Sections 5.4, 5.5. or 5.6, below.

5.     *Default; Acceleration*.  The occurrence of any one or more of the following events with respect to the Company constitutes an event of default hereunder ("*Event of Default*"):

5.1     *Nonpayment*.  If the Company fails to pay the Principal of this Note and accrued interest thereon when due;

5.2     *Breach*.  If the Company breaches any covenant or representation or warranty in this Note or the Security Agreement;

5.3     *Exit Acquisition*.  If an Exit Acquisition occurs.

5.4     *Voluntary or Involuntary Bankruptcy etc.*  Company voluntarily or involuntarily becoming subject to any proceeding under: (a) the Bankruptcy Code;

Case: 21-04040   Doc# 1   Filed: 11/08/21   Entered: 11/08/21 15:40:46   Page 19 of 121

(b) any similar remedy under state statutory or common law; or (c) admits in writing its inability to pay debts generally as they become due.

     5.5    ***Court Order Not Vacated***.  If within 60 days after the commencement of proceedings against the Company seeking any bankruptcy, insolvency, liquidation, dissolution or similar relief under any present or future statute, law or regulation (a) such action has not been dismissed or all orders or proceedings thereunder affecting the operations or the business of the Company stayed, or (b) the stay of any such order or proceedings has been set aside, or, within 60 days after the appointment without the consent or acquiescence of the Company of any trustee, receiver or liquidator of the Company or of all or any substantial part of the properties of the Company, the appointment has not been vacated.

     5.6    ***Aggregate Judgments***.  If a final judgment is rendered against the Company that, together with other outstanding final judgments against the Company, exceeds an aggregate of $100,000 and if within 30 days after its entry the judgment has not been discharged or its execution stayed pending appeal and if within 30 days after the expiration of any stay the judgment has not been discharged.

     For a period of ninety (90) days after the occurrence of an Event of Default under this Note (unless all Events of Default have been cured or waived by the Holder) (the ***"Initial Remedies Period"***), the holders of at least 85% of the aggregate Principal of the Bridge Loan Notes may, at their option (a) by written notice to the Company, declare the entire unpaid Principal balance of this Note and the other Bridge Loan Notes, together with all accrued interest thereon and the Repayment Preference, immediately due and payable regardless of any prior forbearance, and (b) exercise any and all rights and remedies available to them under the Security Agreement and under applicable law, including, without limitation, the right to collect from the Company all amounts due under this Note. If the Agent (as defined in the Security Agreement) fails to exercise any of the remedies available to it under Section 9.2 of the Security Agreement during the Initial Remedies Period, then, after the expiration of such Initial Remedies Period, upon 10 day written notice to the other Holders (the "Notice"), any Holder may exercise any and all remedies available to it under this Agreement, the Security Agreement or applicable law, including, without limitation, the right to collect from the Company all amounts due under this Note.  The first Holder giving the Notice to the other Holders shall become the sole "De *Facto* Agent" of the Holders and solely shall have the rights and obligations of the Agent as provided in Section 2 of the Security Agreement.  Any amounts or other proceeds recovered by such Holder acting as the *de* facto Agent shall be shared on a pari passu basis with the Holders of the other Bridge Loan Notes.

    6.    ***Representations, Warranties and Covenants of the Company to Holder***. The Company hereby represents, warrants and covenants to the Holder that:

     6.1    ***Corporate Organization and Authority***.  The Company (a) is a corporation duly organized, validly existing, authorized to exercise all its corporate powers, rights and privileges, and in good standing in the State of California; and (b) has

the corporate power and corporate authority to own and operate its properties and to carry on its business as now conducted.

      6.2    *Capitalization*. The authorized capital stock of the Company consists of:

      (a)    *Preferred Stock*. 20,562,778 shares of Preferred Stock, without par value, of which 20,562,778 shares are designated as Series A Preferred, 11,672,570 of which are duly and validly issued in compliance with applicable laws (including, without limitation, issued in compliance with applicable federal and state securities laws), fully paid, nonassessable and outstanding.

      (b)    *Common Stock*. 40,000,000 shares of Common Stock, of which 12,434,937 shares are duly and validly issued in compliance with applicable laws (including, without limitation, issued in compliance with applicable federal and state securities laws), fully paid, nonassessable and outstanding.

      (c)    *Other Securities*. The Company has reserved 4,948,907 shares of Common Stock for issuance under the Company's stock option plans, under which options to purchase approximately 1,409,301 shares are issued and outstanding as of the date hereof or have been approved for grant. Except as set forth herein and in the Series A Purchase Agreement, and the 2004 Bridge Notes there are no outstanding rights of first refusal, preemptive rights or other rights, warrants, options, conversion privileges, subscriptions, or other rights or agreements, either directly or indirectly, to purchase or otherwise acquire or issue any equity securities of the Company.

      6.3    *Corporate Power*. On the Effective Date, the Company shall have all requisite legal and corporate power and authority to execute, deliver and issue the Note and the Security Agreement, and to carry out and perform its obligations under the terms of this Note and the Security Agreement.

      6.4    *Authorization*. All corporate action on the part of the Company, its officers, directors, and shareholders necessary for the authorization, issuance, and delivery of this Note has been taken. This Note constitutes legally binding and valid obligations of the Company enforceable in accordance with its terms, except to the extent that such enforcement may be subject to applicable bankruptcy, insolvency, reorganization, moratorium, or other laws of general application relating to or affecting enforcement of creditors' rights and laws concerning equitable remedies.

      6.5    *Validity of Note*. This Note, when issued, sold, and delivered in accordance with the terms therein, shall be duly and validly issued (including, without limitation, issued in compliance with applicable federal and state securities laws).; provided, however, that this Note shall be subject to restrictions on transfer under state and/or federal securities laws.

      6.6    *Liabilities*. As of the date hereof, the Company has no material liabilities, debts or obligations, whether accrued, absolute, contingent or otherwise, and whether due or to become due, including, but not limited to, liabilities on account of

5

taxes, other governmental charges or lawsuits other than liabilities incurred since the incorporation of the Company in the ordinary course of business or as disclosed by the Company on its most recent financial statements.

7. **Representations and Warranties of the Holder**. By accepting this Note, the Holder represents and warrants to the Company as follows:

7.1 **Investment**. This Note is made with the Holder in reliance upon the Holder's representation to the Company, which by the Holder's execution of this Note the Holder hereby confirms, that the Note to be received by the Holder will be acquired for investment for the Holder's own account, not as a nominee or agent, and not with a view to the sale or distribution of any part thereof, and that the Holder has no present intention of selling, granting any participation in, or otherwise distributing the Note. By executing this Note, the Holder further represents that it has no contract, undertaking, agreement, or arrangement with any person to sell, transfer, or grant participation to such person or to any third person, with respect to the Note.

7.2 **No Public Market**. The Holder understands and acknowledges that the offering of the Notes will not be registered under the Securities Act on the grounds that the offering and sale of securities contemplated hereby are exempt from registration pursuant to Section 4(2) and or Section 3(b) of the Securities Act of 1933, as amended (the "**Securities Act**"), and that the Company's reliance upon such exemption is predicated upon the Holder's representations as set forth in this Note. The Holder further understands that no public market now exists for any of the securities issued by the Company and that the Company has given no assurances that a public market will ever exist for the Company's securities.

7.3 **Limitations on Transferability**. The Holder covenants that in no event will it dispose of the Note (other than pursuant to Rule 144 promulgated by Commission under the Securities Act ("**Rule 144**") or any similar or analogous rule, unless and until (a) the Holder shall have notified the Company of the proposed disposition and shall have furnished the Company with a statement of the circumstances surrounding the proposed disposition, and (b) if requested by the Company, the Holder shall have furnished the Company with an opinion of counsel satisfactory in form and substance to the Company and the Company's counsel to the effect that (i) such disposition will not require registration under the Securities Act and (ii) appropriate action necessary for compliance with the Securities Act and any applicable state, local, or foreign law has been taken. Notwithstanding the limitations set forth in the foregoing sentence, if the Holder is a partnership or limited liability company it may transfer Notes (or portions thereof) to its constituent partners or a retired partner of such partnership who retires after the date hereof, or its constituent members or retired members of such limited liability company who retires after the date hereof, as the case may be, or to the estate of any such partner, member or retired partner or member or transfer by gift, will, or intestate succession to any such partner's or member's spouse or lineal descendants or ancestors without the necessity of registration or opinion of counsel if the transferee agrees in writing to be subject to the terms of this Agreement to the same extent if such transferee were an Holder, provided, however, that Holder hereby

6

covenants not to effect such transfer if such transfer either would invalidate the securities laws exemptions pursuant to which the Notes were originally offered and sold or would itself require registration and/or qualification under the Securities Act or applicable state securities laws. Each Note transferred as above provided shall bear the appropriate restrictive legend, except that such Note shall not bear such legend if the transfer was made in compliance with subsection (k) of Rule 144 or if the opinion of counsel referred to above is to the further effect that such legend is not required in order to establish compliance with any provisions of the Securities Act.

7.4     *Experience*. The Holder represents that: (a) it has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of its prospective investment in the Notes; (b) it believes it has received all the information it has requested from the Company and considers necessary or appropriate for deciding whether to obtain the Notes; (c) it has had the opportunity to discuss the Company's business, management, and financial affairs with the Company's management; (d) it has the ability to bear the economic risks of its prospective investment; and (e) it is able, without materially impairing its financial condition, to hold the Notes for an indefinite period of time and to suffer a complete loss on its investment.

7.5     *Accredited Investor*. The Holder presently qualifies as an "accredited investor" within the meaning of Regulation D of the rules and regulations promulgated under the Securities Act.

7.6     *Confidentiality*. Each Holder agrees that it will keep confidential and will not disclose or divulge for a period of two (2) years after receipt of any information which such Holder may obtain from the Company, pursuant to financial statements, reports and other materials submitted by the Company as required hereunder or under any other documents, unless such information is known, or until such information becomes known, to the public through no fault of such Holder or its agents, or unless the President of the Company gives his written consent to the Holder's release of such information, except that no such written consent shall be required (and Holder shall be free to release such information) if such information is to be provided to Holder's counsel or accountant, or to an officer, director, general partner, limited partner, shareholder, investment counselor or advisor, or employee of a Holder with a need to know such information; provided that any such counsel, accountant, officer, director, general partner, limited partner, shareholder, investment counselor or advisor, or employee shall be bound by confidentiality provisions no less restrictive than the provisions of this Section 8.6. Notwithstanding the foregoing, this Section 8.6 shall not apply (a) to information which a Holder learns from a third party with the right to make such disclosure, provided Holder complies with the restrictions imposed by the third party, (b) to information which is in Holder's possession prior to the time of disclosure by the Company and not acquired by Holder under a confidentiality obligation, (c) to the extent (after requesting and pursuing confidential treatment to the extent reasonably possible) the Holder is required to disclose such information by law or a governmental regulatory authority, and (d) to the extent (after requesting and pursuing confidential treatment to the extent reasonably possible) Holder is required to disclose such information by court order.

7

7.7    Holder and Company intend that this Note qualify for the exemption set forth in Section 25118(b) of the California Corporations Code with respect to California's usury provisions. In this regard, Company and Holder hereby represent, warrant and agree as follows:

(A)    All the Notes made to holders under the Bridge Loan by the Company constitute a single coordinated loan made to Company by holders of the Bridge Loan Notes; and

(B)    Holder by reason of its business and financial experience has the capacity to protect its own interests in connection with the Note and the Bridge Loan.

8.    *Miscellaneous.*

8.1    *Waiver by the Company.*  The Company waives diligence, presentment, protest, demand and notice of protest, demand, dishonor and nonpayment of this Note, and expressly agrees that this Note, and any payment under it, may be extended and any security may be accepted, released or substituted by the Holder from time without in any way affecting the liability of the Company.

8.2    *Waiver by the Holder and Amendment.*  No delay or omission by the Holder to exercise any right or remedy accruing upon any Event of Default shall (a) impair any right or remedy, (b) waive any default or operate as an acquiescence to the Event of Default, or (c) affect any subsequent default of the same or of a different nature. Any provision of this Note may be waived only upon the express written consent of the Holder. Any provision of this Note may be amended or modified only upon the express written consent of the Company and the Holder; provided, however, that this Note may be amended together with all other Bridge Loan Notes by the Holders of at least 85% of the aggregate principal amount of all the Bridge Loan Notes so long as such amendment does not affect the Holder in a disproportionate manner relative to the other holders of Bridge Loan Notes.

8.3    *Restrictions on Transfer; Assignment.*  The Holder may at any time sell or assign to any person all or any part of its interest in this Note. The Company will not assign this Note or any or its rights duties or obligations under this Note without first obtaining the written consent of the Holder. Any Exit Acquisition will be deemed an assignment. This Note may only be transferred in compliance with applicable state and federal laws.

8.4    *Successors.*  All rights and obligations of the Company and the Holder shall be binding upon and benefit the successors, assigns, heirs, and administrators of the parties. As used in this Note, the Company includes any corporation, partnership, limited liability company or other entity that succeeds to or assumes the obligations of the Company under this Note. *"Holder"* means any person who is at the time the registered holder of this Note.

8.5    *Fees and Expenses; Costs of Collection.*  The Company and the Holder shall bear all legal fees in connection with the negotiation and execution of this

Case: 21-04040   Doc# 1   Filed: 11/08/21   Entered: 11/08/21 15:40:46   Page 24 of 121

Note, except that the Company shall reimburse up to an aggregate amount not to exceed $2,000.00 to the holders of the Bridge Loan Notes for legal fees in connection with the preparation and negotiation of this Note, the Security Agreement, and other transactions related to the foregoing. The Company agrees to reimburse the Holder for all out of pocket expenses of the Holder and, to the extent permitted by applicable law, all attorney fees and expenses incurred by the Holder in connection with the collection and enforcement of this Note. Such expenses include those related to, but not limited to: (a) the administration and enforcement of this Note; (b) any waiver or amendment of any provision of this Note; (c) the exercise or enforcement of any of the rights, powers, or remedies of the Holder under this Note at equity or at law, whether or not suit is filed; (d) any workout, refinancing, restructuring, or reorganization of the Company, including attorney's fees incurred by the Holder pursuant to proceedings arising under the Bankruptcy Code or any other applicable federal or state law; and (e) disbursements, appraiser's fees and court costs in the event collection procedures are commenced by the Holder.

      8.6    ***Rights and Remedies Cumulative***. The rights and remedies of the Holder under this Note and the Security Agreement and as may otherwise be available at law or in equity are cumulative and concurrent and at the sole discretion of the Holder may be pursued singly, successively or together and exercised as often as the Holder desires.

      8.7    ***Governing Law; Venue***. This Note will be governed and construed in accordance with the laws of the State of California, excluding its choice of law or conflicts of law principles. Exclusive jurisdiction and venue of any actions connected with this Note will be in San Francisco County, California, if in State Court, and in the Northern District, State of California, if in Federal Court. In any action brought under or arising out of this Note, the Company and the Holder hereby consent to the *in personam* jurisdiction of any state or federal court selected herein. The Company and the Holder waive any claim or defense that such forum is not convenient or proper, and consent to service of process by any means authorized by the law of that forum.

      8.8    ***TRIAL BY JURY***. THE COMPANY HEREBY WAIVES AND AGREES THAT THE COMPANY WILL NOT ASSERT IN ANY CAPACITY ANY RIGHT TO TRIAL BY JURY IN ANY FORUM WITH RESPECT TO ANY ISSUE, CLAIM, DEMAND OR ACTION ARISING OUT OF OR BASED UPON THIS NOTE, WHETHER FOUNDED IN CONTRACT, TORT OR OTHERWISE.

      8.9    ***Notices***. Any notice required or permitted hereunder shall be given in writing and shall be conclusively deemed effectively given upon personal delivery or delivery by courier, or on the first business day after transmission if sent by confirmed facsimile transmission or electronic mail transmission, or five days after deposit in the United States mail, by registered or certified mail, postage prepaid, addressed (a) if to the Company, as set forth herein, and (b) if to the Holder, at the Holder's address as set forth herein, or at such other address as the Company or the Holder may designate by 10 days' advance written notice to the other party hereto.

9

8.10 *Lost or Stolen Note*. Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction, or mutilation of this Note and, in the case of loss, theft or destruction, upon receipt of an indemnity reasonably satisfactory to the Company, or in the case of mutilation, upon surrender and cancellation of this Note, the Company, at its expense, will make and deliver a new Note, of like tenor, in lieu of the lost, stolen, destroyed or mutilated Note.

8.11 *Treatment of Note*. To the extent permitted by generally accepted accounting principles, the Company will treat, account and report the Note as debt and not equity for accounting purposes and with respect to any returns filed with federal, state or local tax authorities.

8.12 *No Shareholder Rights*. Nothing contained in this Note will be construed as conferring upon the Holder or any other person any of the rights held by a shareholder of the Company either at law or in equity. This Note does not confer the right to vote, or to consent to or to receive notice as a shareholder in respect of meetings of shareholders for the election of directors of the Company.

8.13 *Severability*. If one or more provisions of this Note are held unenforceable under applicable law, the unenforceable provision will be excluded from this Note and the balance of this Note will be interpreted as if such provision were so excluded and will be enforceable in accordance with its terms. The parties to this Note agree to replace any void or unenforceable provision of this Note with a valid and enforceable provision that will achieve, to the extent possible, the economic, business, and other purposes of the void or unenforceable provision.

8.14 *Heading; References*. All headings used herein are used for convenience only and will not be used to construe or interpret this Note. Except where otherwise indicated, all references herein to Sections refer to Sections of this Note.

8.15 *Entire Agreement*. This instrument, the Subordination Agreement and the Security Agreement represent the entire agreement between the parties hereto with respect to this Note and its terms and conditions.

8.16 *Materiality*. Except as limited elsewhere in this Note, if either Company or Holder(s) is in default or breach of any of the provisions of the Note, such default or breach must be material before the other party may seek an appropriate remedy as provided under this Note. Furthermore, except as limited elsewhere in this Note, whenever the Note requires performance by either Company or Holder(s), such performance must be substantial.

*[Signature Page Follows]*

10

IN WITNESS WHEREOF, the Company has caused this Note to be made as of the date first above written.

CREAGRI, INC,

a California corporation

By: _[signature]_

Its: PRESIDENT & CEO

**Agreed and Accepted by the Holder:**

Burrill Nutraceuticals Capital Fund, L.P.

By: _[signature]_

Name: _____

Title: _____

Address: _____
_____

SIGNATURE PAGE TO BURRILL NUTRACEUTICALS CAPITAL FUND, L.P. SECURED PROMISSORY NOTE

# EXHIBIT B

**CreAgri 2004 Convertible Note Bridge Funding:**

17-Feb-04

| Name | Principal Amount of Note | % of Bridge |
|---|---|---|
| Burrill Nutraceuticals Fund | $656,974 | 32.8% |
| POSCO BioVentures | $344,214 | 17.2% |
| DSM Venturing | $258,160 | 12.9% |
| Foragen Technologies | $172,107 | 8.6% |
| Aurora Equity | $17,211 | 0.9% |
| Pierluigi Zappacosta & Enrica D'Ettore | $15,646 | 0.8% |
| UBS Pain Webber (Mary Falvey) | $4,282 | 0.2% |
| Roberto Crea | $524,572 | 26.2% |
| ARCI Holdings | $6,834 | 0.3% |
| **Total** | **$2,000,000** | **100.0%** |

**CreAgri 2008  Bridge Note Funding:**

1-May-08

| Name | Amount Converted from Emergency Note | Additional Principal | Total 2008 Bridge Principal Amount | % of Bridge |
|---|---|---|---|---|
| Burrill Nutraceuticals Fund | $150,625 | $222,638 | $373,263 | 37.9% |
| POSCO BioVentures | | $116,649 | $116,649 | 11.8% |
| DSM Venturing | | $0 | $0 | 0.0% |
| Foragen Technologies | | $58,324 | $58,324 | 5.9% |
| Aurora Equity | | $5,833 | $5,833 | 0.6% |
| Pierluigi Zappacosta & Enrica D'Ettore | | $5,303 | $5,303 | 0.5% |
| Mary Falvey | | $1,451 | $1,451 | 0.1% |
| Roberto Crea | $422,193 | $0 | $422,193 | 42.8% |
| ARCI Holdings | | $2,316 | $2,316 | 0.2% |
| **Total** | | | **$985,332** | **100.0%** |

# EXHIBIT C

## STOCK AND NOTES PURCHASE AND SALE AGREEMENT

This Stock and Notes Purchase and Sale Agreement (the "Agreement") is entered into as of April 30, 2009, by and among Dr. Roberto Crea, an individual (the "Buyer"), and the persons and entities named on the signature page to this Agreement (each of them a "Seller" and collectively the "Sellers"). The Buyer and the Sellers are collectively referred to as the "Parties."

## RECITALS

A.    As consideration for the Sellers' investment of funds in 2002 in CreAgri, Inc., a California corporation (the "Company"), the Company has issued to Sellers outstanding Series A Preferred Shares (the "Preferred Shares"), as indicated in the capitalization table, attached hereto as Exhibit A;

B.    In connection with various bridge financings that occurred between 2004 and 2008, the Company has also issued promissory notes (the "Outstanding Notes") payable to the order of Sellers, and also indicated in Exhibit A;

C.    The Sellers, as owners of the issued and outstanding Preferred Shares and holders in due course of the Outstanding Notes, wish to sell the Preferred Shares and the Outstanding Notes to the Buyer, and the Buyer wishes to purchase the Preferred Shares and the Outstanding Notes on the terms and conditions set forth in this Agreement;

D.    The Board of Directors of the Company has approved on April 10, 2009, the transactions contemplated by this Agreement; and

E.    Prior to Closing, each of the Sellers shall have duly appointed Burrill & Company (Nutraceuticals GP), LLC, a Delaware limited liability company (the "Custodian") as custodian to receive payment of the consideration hereunder on behalf of the Sellers and to distribute such payment to the Sellers as appropriate, as indicated in the attached Exhibit B. The Sellers understand and agree that payment of the consideration hereunder by the Buyer to the Custodian shall constitute payment to the Sellers hereunder for all purposes and Buyer shall have no further liability to the Sellers after making such payment to the Custodian; provided, however, that all the Sellers acting jointly shall give timely notice to Buyer of changes in the custodianship arrangements no fewer than fifteen (15) days prior to a payment and Buyer shall act in accordance with such notice.

NOW, THEREFORE, in consideration of the premises and the mutual promises, representations, warranties and covenants contained in this Agreement, the Parties agree as follows:

1

## ARTICLE 1: ACCURACY OF RECITALS

1.1    The recitals stated above are true, complete, and accurate, and form a material part of this Agreement.

## ARTICLE 2: SALE AND PURCHASE OF THE PREFERRED SHARES AND OUTSTANDING NOTES

2.1    <u>Sale of Preferred Shares and Outstanding Notes</u>.  Subject to the terms and conditions set forth in this Agreement, on the Closing Date, as defined below, Sellers shall sell and deliver the Preferred Shares and the Outstanding Notes to Buyer, and Buyer shall purchase the Preferred Shares and Outstanding Notes from Sellers (the "Transaction").

2.2    <u>Purchase Price</u>.  As full payment for the purchase and transfer of the Preferred Shares and Outstanding Notes by Sellers to Buyer, Buyer shall pay the aggregate amount of Three Million Dollars ($3,000,000.00) (the "Purchase Price").

2.3    <u>Payment Terms</u>.  The Purchase Price shall be paid by Buyer as follows:

(i) One Hundred Thousand Dollars ($100,000.00) (the "Downpayment") shall be paid by Buyer to the Custodian at the Closing, as defined below, by bank wire transfer of readily available funds to an account indicated by the Sellers;

(ii) Two Million Nine Hundred Thousand Dollars ($2,900,000.00) shall be paid by the Buyer in installments pursuant to that certain Unsecured Promissory Note (the "Note"), issued at Closing and dated as of the Closing Date, a form of which is attached hereto as <u>Exhibit C</u>.

2.4    <u>Net Revenues</u>.  In addition to the Purchase Price, in consideration for the Sellers' waiver of the Company's default under their respective Outstanding Notes , the Company shall pay Sellers an amount equal to ten percent (10%) of the Net Revenues of the Company, if any, during the period from May 1, 2011 to April 30, 2013 (the "Earnout Amount").  Payment for a 12 months period ending April 30th shall be due within 60 days following the end of the period in question. For purposes of this Agreement, Net Revenues shall mean gross revenues of the Company minus discounts, returns, and allowances and sales, use and excise taxes.  The Earnout Amount, if any, shall not exceed one Million Dollars ($1,000,000.00).

2.5    <u>Effect of Payment to Custodian</u>.  The Parties agree that payment to the Custodian under Articles 2.3 and 2.4 above shall constitute payment to the Sellers hereunder for all purposes and Buyer shall have no further liability to the Sellers after making such payment to the

2

Custodian. Sellers may give timely notice to Buyer in accordance with Recital E, above, of changing in the custodianship arrangements prior to payment, which will affect Buyer and, prospectively, Buyer recognizes the rights of Sellers to change such arrangements.

2.6 <u>Guaranty</u>. Buyer shall personally guarantee payment of the Earnout Amount under Article 2.4 above in the event the Company is Financially Unable to fulfill such obligation, pursuant to a Guaranty, in the form attached hereto as <u>Exhibit D</u>.

2.7 <u>Definition of Liquidation Event and Change of Control</u>. For purposes of this Agreement:

(i) A ***Liquidation Event*** is defined as a liquidation, dissolution, or voluntary or involuntary bankruptcy of the Company, which in the event of an involuntary bankruptcy, is not dismissed within sixty (60) days after the date of filing.

(ii) A ***Change of Control*** is defined as a sale of all or substantially all of the assets of the Company, the acquisition of the Company by another entity by means of consolidation, corporate reorganizations or merger, sale of assets or other transaction in which more than fifty percent (50%) of the outstanding voting power of the Company is disposed of.

2.8 <u>Acceleration</u>.

(i) Upon the occurrence of a Liquidation Event, the outstanding principal balance of the Note, any accrued and unpaid interest thereon, and the Earnout Amount, if any, shall become immediately due and payable.

(ii) Upon the occurrence of a Change of Control:

    a. Any outstanding principal balance of the Note and any accrued and unpaid interest thereon shall become immediately due and payable.

    b. In lieu of the Earnout Amount, an amount of up to One Million Dollars ($1,000,000.00) shall become immediately due and payable but only to the extent the consideration paid in connection with the Change of Control is greater than Three Million Dollars ($3,000,000.00). In that event, the payment shall equal the amount by which the Change of Control consideration exceeds Three Million Dollars ($3,000,000.00), up to the maximum One Million Dollars ($1,000,000.00).

3

Case: 21-04040    Doc# 1    Filed: 11/08/21    Entered: 11/08/21 15:40:46    Page 33 of 121

## ARTICLE 3: CLOSING

3.1 <u>Closing</u>. The Transaction shall take place ("Closing") at the offices of Valla & Associates, Inc., P.C., 1990 N. California Blvd., Suite 620, Walnut Creek, CA 94596, on April 30, 2009, or at such other time and place as the Parties may mutually agree in writing (the "Closing Date").

3.2 <u>Deliveries by Buyer at Closing</u>. At the Closing, Buyer shall make the Downpayment by bank wire transfer of readily available funds to an account previously indicated by the Custodian. In addition, Buyer shall execute and deliver the Note and the Guaranty.

3.3 <u>Deliveries by Sellers at Closing</u>. At the Closing, the Sellers shall deliver the following:

(i) Each Seller shall deliver the original Stock Certificate(s) of the Company, representing the Preferred Shares issued to each Seller, accompanied by Stock Powers executed in blank and in form sufficient to vest title fully in the Buyer to all of such Preferred Shares;

(ii) Each Seller shall deliver original Outstanding Note(s), accompanied by an endorsement or assignment thereof to Buyer;

(iii) Each Seller shall deliver to the Custodian its executed copy of the Custodian Agreement in the form attached hereto as <u>Exhibit E</u>;

(iv) Sellers shall deliver all necessary UCC-3 Termination Statements pursuant to Article 6.2 below;

(v) Sellers shall cause Roger Wyse and Leo Kim to deliver their written resignations as directors of the Company, and shall cause Roger Wyse to deliver his written resignations as an officer of the Company effective the Closing Date; and

(vi) Sellers shall deliver a Closing Certificate, in the form attached hereto as <u>Exhibit F</u>, dated as of the Closing Date, certifying that the Sellers' representations and warranties in this Agreement are true and correct as of the date of this Agreement and as of the Closing Date.

4

## ARTICLE 4: REPRESENTATIONS AND WARRANTIES OF THE SELLERS

As of the date of this Agreement and as of the Closing Date, each Seller hereby represents and warrants as to that Seller to Buyer that:

4.1     Seller has the legal capacity and authority to execute, deliver, and perform this Agreement.

4.2     Seller is the lawful record and beneficial owner of the Preferred Shares and the holder in due course of the Outstanding Notes.  The Seller on the Closing Date shall transfer to Buyer good, valid, and marketable title to that Seller's Preferred Shares and Outstanding Notes, free and clear of any and all liens, pledges, encumbrances, and restrictions.

4.3     Each Seller represents that there are no outstanding or authorized shares, options, warrants, or purchase, subscription, call, conversion, exchange or other contracts or instruments convertible into shares (the "Securities") obligating each Seller to sell, exchange or otherwise receive or acquire Securities of the Company.

4.4     No governmental, regulatory, or any other third party consent is required to sell the Preferred Shares and the Outstanding Notes.

## ARTICLE 5: REPRESENTATIONS AND WARRANTIES OF THE BUYER

As of the date of this Agreement and as of the Closing Date, Buyer hereby represents and warrants to Sellers that:

5.1     Buyer has readily available funds to pay the Downpayment on the Closing Date.

5.2     Buyer enjoys a personal net worth of not less than three (3) times the principal amount of the Note as evidenced  by an independent estimate of Real Estate and Winery Facilities in Capalbio, Italy, delivered by Buyer to the Custodian prior to the Closing.  A copy of such document is attached hereto as Exhibit G.

## ARTICLE 6: RELEASES BY SELLERS

6.1     Release of Claims.  In exchange for the consideration hereunder, Sellers hereby agree to release completely and discharge forever Buyer and the Company from any and all claims, whether known, unknown, present, past, and future that Sellers may have at the date this Agreement is executed, at Closing and after the Closing, with respect to the Preferred Shares and Outstanding Notes, except for claims arising out of this Agreement.

5

*EXECUTION COPY*

*STOCK AND NOTES PURCHASE AND SALE AGREEMENT*

**SECTION 1542. GENERAL RELEASE.** A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

The Parties voluntarily elect to waive the rights described in Section 1542, and to waive all claims that now exist in their favor, known or unknown, arising from or in any way connected to the Preferred Shares and Outstanding Notes.

6.2     Release of Liens.  Sellers hereby release any liens they may have acquired in connection with the past bridge financings of the Company on the Company's assets, including the Company's intellectual property rights.  The underlying assets and intellectual property rights shall be free and clear of any claims and rights of Sellers, or any party claiming through Sellers, as of the Closing Date.  Sellers shall cause the filing of UCC-3 Termination Statements of any liens so created prior to or as of the Closing Date.

## ARTICLE 7: BUYER'S INDEMNITY

7.1     Buyer shall indemnify, defend, and hold harmless each Seller from and against all current and future liabilities (the "Claims") of the Company.  If any of the Sellers receives notice of circumstances that would give rise to a Claim by that party or notice of any Claim or the commencement of any action or proceeding with respect to which Buyer is obligated to provide indemnification pursuant to this Article, any such Seller shall promptly give the Buyer notice thereof in writing within forty-five (45) days of any Claim or proceeding being made or threatened.  Buyer shall have the right to choose his own Counsel to defend the Claim and Sellers shall cooperate in the defense of the Claim at Sellers' own expenses.  Such provision shall not apply to any proceeding involving claims for which indemnification is not granted hereunder.  Defense of any such claims shall be conducted exclusively by the Sellers, at their own expenses, without the involvement of Buyer.

## ARTICLE 8: MISCELLANEOUS

8.1     Costs.  Each Party shall bear its own costs in connection with the Transaction.

8.2     Further Assurances.  On and after the Closing, Sellers and Buyer shall prepare, execute, and deliver such further instruments of release, sale, assignment or transfer to perfect, confirm or evidence the transactions hereunder.

8.3     Notices.  All notices, demands, requests, or other communications that may be or are required to be given hereunder, shall be given in writing and shall be delivered in person,

6

*EXECUTION COPY*

*STOCK AND NOTES PURCHASE AND SALE AGREEMENT*

mailed by registered or certified mail, return receipt requested, delivered by a commercial courier guaranteeing overnight delivery, or sent by electronic mail or fax, as follows:

If to Buyer:

Dr. Roberto Crea
700 Occidental Avenue
San Mateo, CA 94402
arci@aol.com
Fax No.: (650) 343-7466

If to Sellers:

Burrill & Company (Nutraceuticals GP), LLC
as Custodian for the Sellers
One Embarcadero Center, Suite 2700
San Francisco, CA 94111
Attn: Victor A. Hebert
vhebert@b-c.com
Fax No.: (415) 591-5401

With a copy to:

Valla & Associates, Inc., P.C.
Attn: Antonio Valla, President
1990 N. California Blvd., Suite 620
Walnut Creek, CA 94596
antonio.valla@vallalaw.com
Fax No.: (925) 705-7629

If to Company:

CreAgri, Inc.
25565 Whitesell Ave.
Hayward, CA 94545
Fax No.: (510) 732-6493

With a copy to:

Dalsin Law, LLP
Attn: Ann M. Dalsin
88 Willow Drive
Walnut Creek, CA 94595
ann.dalsin@dalsinlaw.com
Fax No.: (925) 934-7759

    8.4   Governing Law. This Agreement shall be governed by the laws of the State of California exclusive of its conflict of law provisions.

    8.5   Entire Agreement: Modification; Waiver. This Agreement constitutes the entire agreement between the Parties pertaining to the subject matter contained in it and supersedes all

7

Case: 21-04040   Doc# 1   Filed: 11/08/21   Entered: 11/08/21 15:40:46   Page 37 of 121

prior and contemporaneous agreements, representations, and understandings of the Parties. No supplement, modification, or amendment of this Agreement shall constitute a waiver of any other provision, whether or not similar, nor will any waiver constitute a continuing waiver. No waiver shall be binding unless executed in writing by the waiving party.

8.6 <u>Arbitration</u>. Any dispute between the Parties arising out of this Agreement shall be submitted to final and binding arbitration in the City of San Francisco, California, USA, under the Commercial Arbitration Rules of the American Arbitration Association then in effect, upon written notice and demand of any party therefor. The arbitration shall be conducted by one (1) arbitrator, in the English language. Any arbitration award rendered shall be binding, final and conclusive upon all parties, and judgment thereon may be entered in any Court having jurisdiction thereof. The arbitrator shall have discretion to award to the prevailing party as reasonable attorney's fees and costs from the other party such amounts as the arbitrator determines.

8.7 <u>Severability</u>. If any provision of this Agreement is held invalid or unenforceable by any arbitrator or court of final jurisdiction, it is the intent of the Parties that all other provisions of this Agreement be construed to remain fully valid, enforceable, and binding on the Parties.

8.8 <u>Counterparts; Facsimile and PDF Signature</u>. This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, and such counterparts together shall constitute only one original. This Agreement may be executed and delivered by facsimile or in PDF attached to an electronic communication. On delivery by facsimile or PDF, the facsimile or PDF signature shall be deemed to have the same effect as if the original signature had been delivered to the other Parties. The original signature copy must be delivered to the other Parties by express overnight delivery, but the failure to deliver the original signature copy or the nonreceipt of the original signature copy shall have no effect on the binding and enforceable nature of this Agreement.

8.9 <u>Forms 1099</u>. Annually, after December 31, but on or before January 31, ending January 31, 2014 (or sooner if there is an accelaration under Article 2), Buyer shall prepare, and, if appropriate, cause the Company to prepare, IRS Forms 1099 to each Seller with respect to payments that under applicable law are required to be sent to the Sellers and filed with the IRS.

*[REMAINDER OF THE PAGE INTENTIONALLY LEFT BLANK]*

8

*EXECUTION COPY*

*STOCK AND NOTES PURCHASE AND SALE AGREEMENT*

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the date first above written.

**BUYER:**

Dr. Roberto Crea

**SELLERS:**

BURRILL NUTRACEUTICALS CAPITAL FUND, L.P.
By Burrill & Company (Nutraceuticals GP), LLC

By: _____
Name: G. Steven Burrill
Title: Managing Member

POSCO BIOVENTURES I, L.P.

By: _____
Name: Leo Kim
Title: _____

DSM VENTURING BV

By: _____
Name:
Title: _____

9

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the date first above written.

BUYER:

Dr. Roberto Crea

SELLERS:

BURRILL NUTRACEUTICALS CAPITAL FUND, L.P.
By Burrill & Company (Nutraceuticals GP), LLC

By: _____
Name: G. Steven Burrill
Title: Managing Member

POSCO BIOVENTURES II, L.P.

By: _____
Name: Leo Kim
Title:

DSM VENTURING BV

By: _____
Name:
Title:

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the date first above written.

**BUYER:**

_____
Dr. Roberto Crea

**SELLERS:**

BURRILL NUTRACEUTICALS CAPITAL FUND, L.P.
By Burrill & Company (Nutraceuticals GP), LLC

By: _____
Name:  G. Steven Burrill
Title:  Managing Member

POSCO BIOVENTURES I, L.P.

By: _____
Name:  Leo Kim
Title:  Managing Director

DSM VENTURING BV

By: _____
Name:
Title: _____

9

*EXECUTION COPY*

*STOCK AND NOTES PURCHASE AND SALE AGREEMENT*

IN WITNESS WHEREOF, the Parties hereto have duly executed this Agreement as of the date first above written.

**BUYER:**

Dr. Roberto Crea

**SELLERS:**

BURRILL NUTRACEUTICALS CAPITAL FUND, L.P.
By Burrill & Company (Nutraceuticals GP), LLC

By:
Name: G. Steven Burrill
Title: Managing Member

POSCO BIOVENTURES I, L.P.

By:
Name: Teo Kim
Title:

DSM VENTURING BV

By:
Name: Rob van Leen
Title: Directors

Yvonne Engelen

FORAGEN TECHNOLOGIES LIMITED PARTNERSHIP

By: _Armand Lavoie_
Name: Armand Lavoie
Title: _Managing Director_

AURORA EQUITY LLC

By: _____
Name: Jaleh Daie
Title: Managing Partner

Pierluigi Zappacosta and Enrica D'Ettorre JTWROS

_____

_____
Mary Falvey, an individual

UBS Paine Webber, Custodian for Mary C. Falvey, IRA

By: _____
Name: _____
Title: _____

## AGREEMENT BY CREAGRI, INC.

CreAgri, Inc. hereby joins in and agrees to fulfill the Earnout Amount payment obligation pursuant to Article 2.4 of this Agreement by signing below:

10

FORAGEN TECHNOLOGIES LIMITED PARTNERSHIP

By: _____
Name:  Armand Lavoie
Title: _____

AURORA EQUITY LLC

By _____
Name: Jaleh Daie
Title: Managing Partner

Pierluigi Zappacosta and Enrica D'Ettorre JTWROS

_____

_____
Mary Falvey, an individual

UBS Paine Webber, Custodian for Mary C. Falvey, IRA

By: _____
Name: _____
Title: _____

## AGREEMENT BY CREAGRI, INC.

CreAgri, Inc. hereby joins in and agrees to fulfill the Earnout Amount payment obligation pursuant to Article 2.4 of this Agreement by signing below:

10

*EXECUTION COPY*

*STOCK AND NOTES PURCHASE AND SALE AGREEMENT*

FORAGEN TECHNOLOGIES LIMITED PARTNERSHIP

By: _____
Name: Armand Lavoie
Title: _____


AURORA EQUITY LLC


By: _____
Name: Jaleh Daie
Title: Managing Partner


Pierluigi Zappacosta and Enrica D'Ettorre JTWROS

_____

_____
Mary Falvey, an individual


UBS Paine Webber, Custodian for Mary C. Falvey, IRA


By: _____
Name: _____
Title: _____

## AGREEMENT BY CREAGRI, INC.

CreAgri, Inc. hereby joins in and agrees to fulfill the Earnout Amount payment obligation pursuant to Article 2.4 of this Agreement by signing below:

10

FORAGEN TECHNOLOGIES LIMITED PARTNERSHIP


By:
Name:  Armand Lavoie
Title:


AURORA EQUITY LLC


By:
Name:  Jaleh Daie
Title:   Managing Partner


Pierluigi Zappacosta and Enrica D'Ettorre JTWROS


Mary Falvey, an individual


UBS Paine Webber, Custodian for Mary C. Falvey, IRA


By:
Name:
Title:

## AGREEMENT BY CREAGRI, INC.

CreAgri, Inc. hereby joins in and agrees to fulfill the Earnout Amount payment obligation pursuant to Article 2.4 of this Agreement by signing below:


10

*EXECUTION COPY*

*STOCK AND NOTES PURCHASE AND SALE AGREEMENT*

## FORAGEN TECHNOLOGIES LIMITED PARTNERSHIP

By:_____
Name:  Armand Lavoie
Title:_____


AURORA EQUITY LLC


By:_____
Name:  Jaleh Daie
Title:   Managing Partner


Pierluigi Zappacosta and Enrica D'Ettorre JTWROS

_____


_____
Mary Falvey, an individual


UBS Paine Webber, Custodian for Mary C. Falvey, IRA

By:_____ 1.30.09
Name: _Dave, Norman_
Title: _Dir, ASset Mm_

## AGREEMENT BY CREAGRI, INC.

CreAgri, Inc. hereby joins in and agrees to fulfill the Earnout Amount payment obligation pursuant to Article 2.4 of this Agreement by signing below:

10

*EXECUTION COPY*

*STOCK AND NOTES PURCHASE AND SALE AGREEMENT*

CREAGRI INC.

By: _____

Name: Christopher Dela

Title: Co - CEO

11

*EXECUTION COPY*

*STOCK AND NOTES PURCHASE AND SALE AGREEMENT*

**EXHIBIT A**

**CAPITALIZATION TABLE**

12

## CREAGRI CAP TABLE

| | # Shares | Investment | % Ownership | |
|---|---|---|---|---|
| **Common** | | | | |
| Rolando Colantoni | 86,000 | | 0.3% | |
| Luciano Caglioti | 106,000 | | 0.4% | |
| Giovanni Battista Zorzoli | 66,000 | | 0.2% | |
| Gioia Vaccari | 48,000 | | 0.2% | |
| Franco Serani | 19,000 | | 0.1% | |
| Donald Ladwig | 49,000 | | 0.2% | |
| ARCI Holdings | 7,284,004 | | 25.1% | |
| Dawn McGuire | 10,490 | | 0.0% | |
| Jacques Van Boom | 5,000 | | 0.0% | |
| Roberto Crea | 4,761,443 | | 16.4% | |
| | | | | |
| **Series A Preferred (2002)** | | | | Series A pro rata: |
| Burrill Nutraceuticals Fund | 5,112,385 | | 17.6% | 43.8% |
| POSCO BioVentures | 2,678,572 | | 9.2% | 22.9% |
| DSM Venturing | 2,008,929 | | 6.9% | 17.2% |
| Foragen Technologies | 1,339,286 | | 4.6% | 11.5% |
| Aurora Equity | 133,929 | | 0.5% | 1.1% |
| Pierluigi Zappacosta & Enrica D'Ettore | 121,753 | | 0.4% | 1.0% |
| UBS (custodian for Mary Falvey) | 33,321 | | 0.1% | 0.3% |
| Roberto Crea | 191,211 | | 0.7% | 1.6% |
| ARCI Holdings | 53,184 | | 0.2% | 0.5% |
| | | | | 11,672,570 |
| | | | | |
| **Option Pool** | 4,948,807 | | 17.0% | |
| | | | | |
| **Fully Diluted** | 29,056,314 | | 100.0% | |

### CreAgri 2004 Convertible Note Bridge Funding:
17-Feb-04

| Name | | Principal Amount of Note | % of Bridge |
|---|---|---|---|

| | | $656,974 | 32.8% |
|---|---|---|---|
| Burrill Nutraceuticals Fund | | $656,974 | 32.8% |
| POSCO BioVentures | | $344,214 | 17.2% |
| DSM Venturing | | $258,160 | 12.9% |
| Foragen Technologies | | $172,107 | 8.6% |
| Aurora Equity | | $17,211 | 0.9% |
| Pierluigi Zappacosta & Enrica D'Ettore | | $15,646 | 0.8% |
| UBS Pain Webber (Mary Falvey) | | $4,282 | 0.2% |
| Roberto Crea | | $524,572 | 26.2% |
| ARCI Holdings | | $6,834 | 0.3% |
| **Total** | | **$2,000,000** | **100.0%** |

**CreAgri 2008  Bridge Note Funding:**

1-May-08

| Name | Amount Converted from Emergency Note | Additional Principal | Total 2008 Bridge Principal Amount | % of Bridge |
|---|---|---|---|---|
| Burrill Nutraceuticals Fund | $150,625 | $222,638 | $373,263 | 37.9% |
| POSCO BioVentures | | $116,649 | $116,649 | 11.8% |
| DSM Venturing | | $0 | $0 | 0.0% |
| Foragen Technologies | | $58,324 | $58,324 | 5.9% |
| Aurora Equity | | $5,833 | $5,833 | 0.6% |
| Pierluigi Zappacosta & Enrica D'Ettore | | $5,303 | $5,303 | 0.5% |
| Mary Falvey | | $1,451 | $1,451 | 0.1% |
| Roberto Crea | $422,193 | $0 | $422,193 | 42.8% |
| ARCI Holdings | | $2,316 | $2,316 | 0.2% |
| **Total** | | | **$985,332** | **100.0%** |

**CreAgri 2004 Convertible Note Bridge Funding:**

17-Feb-04

| Name | Principal Amount of Note | % of Bridge |
|---|---|---|
| Burrill Nutraceuticals Fund | $656,974 | 32.8% |
| POSCO BioVentures | $344,214 | 17.2% |
| DSM Venturing | $258,160 | 12.9% |
| Foragen Technologies | $172,107 | 8.6% |
| Aurora Equity | $17,211 | 0.9% |
| Pierluigi Zappacosta & Enrica D'Ettore | $15,646 | 0.8% |
| UBS Pain Webber (Mary Falvey) | $4,282 | 0.2% |
| Roberto Crea | $524,572 | 26.2% |
| ARCI Holdings | $6,834 | 0.3% |
| **Total** | **$2,000,000** | **100.0%** |

**CreAgri 2008  Bridge Note Funding:**

1-May-08

| Name | Amount Converted from Emergency Note | Additional Principal | Total 2008 Bridge Principal Amount | % of Bridge |
|---|---|---|---|---|
| Burrill Nutraceuticals Fund | $150,625 | $222,638 | $373,263 | 37.9% |
| POSCO BioVentures | | $116,649 | $116,649 | 11.8% |
| DSM Venturing | | $0 | $0 | 0.0% |
| Foragen Technologies | | $58,324 | $58,324 | 5.9% |
| Aurora Equity | | $5,833 | $5,833 | 0.6% |
| Pierluigi Zappacosta & Enrica D'Ettore | | $5,303 | $5,303 | 0.5% |
| Mary Falvey | | $1,451 | $1,451 | 0.1% |
| Roberto Crea | $422,193 | $0 | $422,193 | 42.8% |
| ARCI Holdings | | $2,316 | $2,316 | 0.2% |
| **Total** | | | **$985,332** | **100.0%** |

# EXHIBIT B

## ALLOCATION OF TOTAL PAYOUT OVER NOTES 2008, CONVERTIBLE NOTES 2004 AND SERIES A PREFERRED

13

Case: 21-04040    Doc# 1    Filed: 11/08/21    Entered: 11/08/21 15:40:46    Page 53 of 121

**Exhibit B**
**Allocation of total payout over Notes 2008, Convertible Notes 2004 and Series A Preferred**

Total payout of 3-4 MM$.
$909,280 will be paid out to 2008 Note holders.
$2090720 - $3090720 will be paid out to Series A preferred and Convertible Note 2004 holders.

**Allocation of payout to notes 2004 and Series A preferred pro rato original investment size:**

| | | |
|---|---|---|
| **Initial investment Series A preferred** | $6,829,980 | 77.35% |
| **Initial investment Note 2004** | $2,000,000 | 22.65% |

| | Series A/Note 2004 Percentage | Payout $2056697 | | Earnout Max 1 MM$ | | TOTAL |
|---|---|---|---|---|---|---|
| | | Series A Preferred | Note 2004 | Series A Preferred | Note 2004 | |
| Burrill Nutraceuticals Capital Fund | 44.73% | $723,441 | $211,841 | $346,025 | $101,325 | $1,382,631 |
| POSCO BioVentures | 23.44% | $379,038 | $110,992 | $181,295 | $53,088 | $724,413 |
| DSM Venturing | 17.58% | $284,278 | $83,244 | $135,972 | $39,816 | $543,310 |
| Foragen Technologies | 11.72% | $189,519 | $55,496 | $90,648 | $26,544 | $362,206 |
| Aurora Equity | 1.17% | $18,952 | $5,550 | $9,065 | $2,654 | $36,221 |
| Zappacosta & D'Ettore | 1.07% | $17,229 | $5,045 | $8,241 | $2,413 | $32,928 |
| UBS (custodian for Mary Falvey) | 0.29% | $4,715 | $1,381 | $2,255 | $660 | $9,012 |
| TOTAL | 100% | $1,617,172 | $473,548 | $773,500 | $226,500 | $3,090,720 |

# EXHIBIT C

## FORM OF UNSECURED PROMISSORY NOTE

14

Case: 21-04040    Doc# 1    Filed: 11/08/21    Entered: 11/08/21 15:40:46    Page 55 of 121

# UNSECURED PROMISSORY NOTE

April 30, 2009                                                    **$2,900,000.00**

FOR VALUE RECEIVED and in connection with the Stock and Notes Purchase and Sale Agreement dated as of April 30, 2009 (the "Agreement"), a copy of which is attached hereto as Exhibit 1, Roberto Crea (the "***Maker***") promises to pay to the order of Burrill & Company (Nutraceuticals GP), LLC, a Delaware limited liability company, as Custodian for the Sellers under the Agreement, or its permitted assigns, transferees and successors as provided herein (the "***Holder***"), or as the Holder may direct, at its offices located at the address of the Holder provided on the signature page hereto or at such other location as the Holder may designate, Two Million Nine Hundred Thousand Dollars ($2,900,000.00) ("***Principal***"), plus simple interest thereon from the date of this Unsecured Promissory Note ("***Note***") at an annual interest rate equal to one percent (1%) (the "***Interest Rate***").

1.  This Note shall be paid according to the following Payment Schedule:

    i.    $150,000.00, plus interest, on October 29, 2009;
    ii.   $750,000.00, plus interest, on April 29, 2010;
    iii.  $1,000,000.00, plus interest, on April 29, 2011;
    iv.   $1,000,000.00, plus interest, on April 29, 2012.

    Each payment under this Note shall be made in the lawful currency of the United States of America by bank wire transfer of immediately available funds to the account designated by the Holder. It is agreed that any payment made by Maker under this Note to the Holder shall constitute payment to the Sellers under the Agreement for all purposes and Maker shall have no further liability to the Sellers after making such payment to the Holder.

2.  Whenever any payment on this Note is stated to be due on a day which is not a business day, the payment will be made on the next succeeding business day.

3.  This Note is subject to the express condition that at no time will the Maker be obligated or required to pay interest or at a rate which could subject the Maker to either civil or criminal liability as a result of being in excess of the maximum rate which the Maker is permitted by law to contract or agree to pay. If, by the terms of this Note, the Maker is at any time required or obligated to pay interest at a rate in excess of such maximum rate, the rate of interest under this Note will be deemed to be immediately reduced to the maximum rate and interest payable under this Note will be computed at the maximum rate and the portion of all prior interest payments in excess of the maximum rate will be applied and will be deemed to have been payments in reduction of the Principal balance of this Note.

1

Initials___
Initials___

*EXECUTION COPY*
*UNSECURED PROMISSORY NOTE*

4.    This Note may be prepaid, in whole or in part, without any penalty and without the prior consent of the Holder.

5.    If an installment of principal and accrued interest on this Note is not paid within ten (10) business days after the due date the entire remaining principal of this Note shall immediately become due and payable in full.  Thereafter, interest on this Note shall accrue on unpaid principal at the rate of five percent (5%) per annum.

6.    Upon the occurrence of a Liquidation Event or Change of Control, as defined in the Agreement, the outstanding principal balance of the Note and any accrued and unpaid interest thereon shall become immediately due and payable.

7.    The Maker and the Holder shall bear their own legal fees and costs in connection with the negotiation and execution of this Note.  The Sellers shall be entitled to recover all costs to collect this Note, including reasonable attorney's fees, in the event of proceedings to collect this Note.

8.    This Note will be governed and construed in accordance with the laws of the State of California, excluding its choice of law or conflicts of law principles.

9.    Any notice required or permitted hereunder shall be given in writing and shall be conclusively deemed effectively given upon personal delivery or delivery by courier, or on the first business day after transmission if sent by confirmed facsimile transmission or electronic mail transmission, or five days after deposit in the United States mail, by registered or certified mail, postage prepaid, addressed (a) if to the Maker, as set forth herein, and (b) if to the Holder, at the Holder's address as set forth herein, or at such other address as the Maker or the Holder may designate by ten (10) days' advance written notice to the other party hereto:

| If to Maker: | If to Holder: |
|---|---|
| Roberto Crea | Burrill & Company (Nutraceuticals GP), LLC |
| 700 Occidental Avenue | as Custodian for the Sellers |
| San Mateo, CA 94402 | One Embarcadero Center, Suite 2700 |
| | San Francisco, CA 94111 |
| | Attn:  Victor A. Hebert |

With a copy to:

Valla & Associates, Inc., P.C.
Attn:  Antonio Valla
1990 N. California Blvd., Suite 620

2

Initials___
Initials___

*EXECUTION COPY*
*UNSECURED PROMISSORY NOTE*

Walnut Creek, CA 94596

10.    If one or more provisions of this Note are held unenforceable under applicable law, the unenforceable provision will be excluded from this Note and the balance of this Note will be interpreted as if such provision were so excluded and will be enforceable in accordance with its terms. The parties to this Note agree to replace any void or unenforceable provision of this Note with a valid and enforceable provision that will achieve, to the extent possible, the economic, business, and other purposes of the void or unenforceable provision.

11.    This instrument represents the entire agreement between the parties hereto with respect to this Note and its terms and conditions.

IN WITNESS WHEREOF, the Maker has caused this Note to be made as of the date first above written.

**MAKER**

By: _____
Name: Roberto Crea, an individual

**Agreed and Accepted by the Holder:**

Burrill & Company (Nutraceuticals GP), LLC
a Delaware limited liability company
as Custodian for the Sellers

By: _____

Name: _____
        Title: _____

Address:  One Embarcadero Center, Suite 2700
               San Francisco, CA 94111

3

Initials___
Initials___

*EXECUTION COPY*
*UNSECURED PROMISSORY NOTE*

**EXHIBIT 1**

**EXECUTED COPY OF STOCK AND NOTES PURCHASE AND SALE
AGREEMENT**

4

Initials___
Initials___

*EXECUTION COPY*
*UNSECURED PROMISSORY NOTE*

PLEASE REFERENCE TAB 5

**EXHIBIT D**

**FORM OF GUARANTY**

15

*EXECUTION COPY*

*STOCK AND NOTES PURCHASE AND SALE AGREEMENT*

# GUARANTY

This Guaranty ("Guaranty") is made as of April 30, 2009, by Roberto Crea, an individual ("Guarantor") in favor of the Sellers to that certain Stock and Notes Purchase and Sale Agreement of even date herewith between the Sellers and Guarantor, as buyer (the "Agreement"), a copy of which is attached hereto as Exhibit A, with reference to the following facts, which are a material part of this Guaranty:

A.    In connection with the Agreement, Sellers have agreed to accept the Purchase Price, through payment to Burrill & Company (Nutraceuticals GP), LLC, a Delaware limited liability company ("Custodian"), and waive the default of the Outstanding Notes, as defined in the Agreement, in exchange for this Guaranty of the obligation of CreAgri, Inc., a California corporation (the "Debtor") to pay Custodian the Earnout Amount, also sometimes hereunder referred to as the "Debt."

B.    In consideration of Sellers accepting the terms above, Guarantor has agreed to guarantee unconditionally payment of the Debt in the event the Debtor is Financially Unable to Pay the Debt, as provided in this Guaranty. Financially Unable to Pay is defined as the Debtor not paying the amount owed to the Custodian on the due date and having a cash amount in US bank account(s) less than the amount owed plus two hundred and fifty thousand ($250,000.00).

THEREFORE, in consideration of the foregoing and for other valuable consideration, the receipt and sufficiency of which Guarantor acknowledges, Guarantor agrees as follows:

1.    Defined Terms.    All capitalized terms not defined herein shall have the meanings ascribed to them in the Agreement.

2.    Guaranty.    Guarantor unconditionally guarantees and agrees to pay to Custodian, or order, on demand, in lawful money of the United States, the Debt only in the event Debtor is Financially Unable to Pay the Debt under the Agreement.    Guarantor hereby waives notice of default by Debtor.

3.    Limited Guaranty.    Guarantor's liability under this Guaranty is limited to the Debt only, and shall not extend to any future debts incurred by the Debtor.

4.    Representations and Warranties of Guarantor.

4.1.    Guarantor represents and warrants that Guarantor has copies of, and is fully familiar with the Agreement, and all its exhibits.

4.2    On and after its execution, this Guaranty will constitute a legal, valid and binding obligation of the Guarantor, enforceable in accordance with its terms.

1

Initials ___

*EXECUTION COPY*
*GUARANTY*

4.3  The Guarantor is not a party to any agreement, whether written or oral, which, in any manner, restricts his right to enter into this Guaranty or to carry out the terms and conditions hereof.

5.      <u>Amendment</u>.  This Guaranty may be modified, altered, or amended only by written agreement signed by Guarantor and Sellers.

6.      <u>Governing Law</u>.  This Guaranty shall be governed by and interpreted and enforced in accordance with the laws of the State of California, except for conflict of laws provisions.

7.      <u>Attorneys' Fees</u>.  The non-prevailing party shall pay reasonable attorneys' fees and costs of the prevailing party.  The prevailing party is the party who received substantially the relief sought, whether by arbitrators' decision, judgment, settlement or otherwise.


IN WITNESS WHEREOF, the Guarantor has executed this Guaranty.


GUARANTOR:


_____
Roberto Crea, an individual

2

Initials ____

*EXECUTION COPY*
*GUARANTY*

**EXHIBIT A**

**EXECUTED COPY OF STOCK AND NOTES PURCHASE AND SALE AGREEMENT**

3

Initials ___

*EXECUTION COPY*
*GUARANTY*

PLEASE REFERENCE TAB 5

# EXHIBIT E

## FORM OF CUSTODIAN AGREEMENT

16

*EXECUTION COPY*

*STOCK AND NOTES PURCHASE AND SALE AGREEMENT*

# CUSTODIAN AGREEMENT

THIS Custodian Agreement is made and entered into as of this 30th day of April, 2009, by and among Burrill & Company (Nutraceuticals GP), LLC, a Delaware limited liability company ("Custodian") and the persons and entities named on the signature page to this Custodian Agreement (each of them a "Seller" and collectively the "Sellers"). Custodian and the Sellers are collectively referred to as the "Parties".

## RECITALS

A. Sellers are parties to the Stock and Notes Purchase and Sale Agreement of even date herewith (the "Agreement"), a copy of which is attached hereto as Exhibit A, providing for their sale to Roberto Crea ("Buyer") of stock and notes issued by CreAgri, Inc. ("CreAgri").

B. Sellers shall also be entitled to receive payment of the Earnout Amount from CreAgri as provided in the Agreement.

C. Sellers are entitled to a portion of the consideration payable under the Agreement as reflected opposite their respective names in Exhibit B to this Custodian Agreement.

D. Sellers desire to appoint Custodian as their custodian to receive payments from Buyer and CreAgri to distribute to Sellers their proportionate share of such payments. Custodian is willing to serve as custodian for Sellers on the terms of this Custodian Agreement. The Parties understand and agree that payment of the consideration under the Agreement by the Buyer to the Custodian shall constitute payment to the Sellers hereunder for all purposes and Buyer shall have no further liability to the Sellers after making such payment to the Custodian.

## THE PARTIES AGREE AS FOLLOWS:

1. Appointment of Custodian. Each of the Sellers hereby appoints Custodian to be the custodian for their account for the receipt of consideration from Buyer and CreAgri under the Agreement and to distribute as appropriate amounts to them. The Parties agree that payment to the Custodian under Articles 2.3 and 2.4 of the Agreement shall constitute payment to the Sellers hereunder for all purposes and Buyer shall have no further liability to the Sellers after making such payment to the Custodian.

2. Attorney-in-Fact. Each of the Sellers appoints Custodian its attorney-in-fact with the special (not general) power to receive payments and to disburse amounts to the Sellers as contemplated by this Custodian Agreement.

3. Reports. Amounts received by Custodian from Buyer and CreAgri shall be distributed promptly to Sellers and shall be accompanied by a report of the amount received, the amounts being distributed and the amounts, if any, used by Custodian to pay costs associated with this Custodian Agreement.

4. Wire Transfers. Each of the Sellers has designated, or within five days from the date of this Custodian Agreement will designate, bank account information to Custodian to enable the transfer by

1

wire of funds to each such Seller. Each of the Sellers shall advise Custodian promptly of any desired changes to such bank account information.

5. <u>Indemnity</u>. Each of the Sellers bears full responsibility to report and pay all taxes of any nature due with respect to the consideration under the Agreement; and each Seller agrees to indemnify and hold harmless Custodian with respect to all such liabilities. Custodian shall have no liability to Sellers, or any one of them, under this Custodian Agreement except for gross negligence or willful misconduct. In the event of any such liability there can be no recovery for consequential or punitive damages of any sort.

6. <u>Resignation; Replacement</u>. Custodian may resign as Custodian at any time for any reason or for no reason without liability or continuing responsibility to the Sellers. The Sellers and the Custodian shall give written notice of the Custodian's resignation to the Buyer and Sellers shall provide new payment instructions in writing to the Buyer sufficiently in advance to allow Buyer to make timely payment of the consideration under the Agreement. Sellers, being all Sellers excluding Burrill Nutraceuticals Capital Fund, L.P. and any of its affiliates, by vote or agreement of a majority in interests of the Sellers may replace Custodian at any time; provided, however, that all such Sellers, acting jointly, shall give prompt notice of the replacement of the Custodian to Buyer and shall provide new payment instructions in writing to the Buyer sufficiently in advance to allow Buyer to make timely payment of the consideration under the Agreement.

7. <u>Expenses</u>. Custodian shall be entitled to deduct from amounts received from Buyer and CreAgri all costs related to its service as Custodian, including bank charges, postage and professional service fees incurred (if such fees are deemed appropriate in the discretion of Custodian). Custodian shall not be entitled to receive compensation under this Custodian Agreement without the unanimous consent of the Sellers.

8. <u>Governing Law</u>. This Custodian Agreement shall be governed by and construed in accordance with the laws of the Sate of California.

9. <u>Miscellaneous</u>. This Custodian Agreement shall be binding upon the successors and assigns of the Parties. Custodian may assign its obligations under this Custodian Agreement to another entity which is wholly owned, directly or indirectly, by Burrill & Company LLC. This Custodian Agreement can only be amended by the written agreement of all Parties hereto. This Custodian Agreement may be executed in counterparts and all such counterparts shall be considered a single agreement of the Parties.

IN WITNESS WHERREOF the Parties have executed and delivered this Custodian Agreement on the date first above written.

**CUSTODIAN:**

Burrill & Company (Nutraceuticals GP), LLC

By:_____

2

Name: _____
Title: _____

**SELLERS:**

BURRILL NUTRACEUTICALS CAPITAL FUND, L.P.
By Burrill & Company (Nutraceuticals GP), LLC

By: _____
Name: G. Steven Burrill
Title: Managing Member

POSCO BIOVENTURES I, L.P.

By: _____
Name: Leo Kim
Title: _____

DSM VENTURING BV

By: _____
Name:
Title: _____

FORAGEN TECHNOLOGIES LIMITED PARTNERSHIP

By: _____
Name: Armand Lavoie
Title: _____

AURORA EQUITY LLC

By: _____
Name: Jaleh Daie
Title: Managing Partner

3

*EXECUTION COPY*

*CUSTODIAN AGREEMENT*

Pierluigi Zappacosta and Enrica D'Ettorre JTWROS

_____

UBS Paine Webber, Custodian for Mary C. Falvey, IRA

By:_____
Name: _____
Title: _____


_____
Mary Falvey, an individual

4

# EXHIBIT A

## EXECUTED COPY OF STOCK AND NOTES PURCHASE AND SALE AGREEMENT

5

PLEASE REFERENCE TAB 5

# EXHIBIT B

6

*EXECUTION COPY*

*CUSTODIAN AGREEMENT*

Case: 21-04040    Doc# 1    Filed: 11/08/21    Entered: 11/08/21 15:40:46    Page 73 of 121

## Exhibit B.

**Total Payout Based on CreAgri sale of $4,000,000 (plus interest)**
Percentages derived from the different liquidation preferences and seniorities of the Note 2008, Note 2004 and Series A Preferred.

**First payment: 3 MM$ plus interest (100 k$ cash and 2.9 MM$ personal Note.)**

| | k$ | % |
|---|---|---|
| Burrill Nutraceutical Capital Fund | 1,541 | 51.35% |
| POSCO Bioventures | 679 | 22.64% |
| DSM venturing | 368 | 12.25% |
| Foragen Technologies | 340 | 11.32% |
| Aurora Equity | 34 | 1.13% |
| Zappacosta & D'Ettore | 31 | 1.03% |
| Falvey | 2 | 0.08% |
| UBS (custodian for Mary Falvey) | 6 | 0.20% |
| **TOTAL** | **3,000.0** | **100.0%** |

**Remaining payment max. 1 MM$ plus interest (Earn out)**

| | k$ | % |
|---|---|---|
| Burrill Nutraceutical Capital Fund | 447 | 44.7% |
| POSCO Bioventures | 234 | 23.4% |
| DSM venturing | 176 | 17.6% |
| Foragen Technologies | 117 | 11.7% |
| Aurora Equity | 12 | 1.2% |
| Zappacosta & D'Ettore | 11 | 1.1% |
| Falvey | 0 | 0.0% |
| UBS (custodian for Mary Falvey) | 3 | 0.3% |
| **TOTAL** | **1000** | **100.0%** |

**EXHIBIT F**

**FORM OF SELLERS' CLOSING CERTIFICATE**

17

# SELLERS' CLOSING CERTIFICATE

The Sellers to that certain Stock and Notes Purchase and Sale Agreement, dated as of April 30 2009 (the "Agreement") hereby certify to Roberto Crea, an individual, that all representations and warranties made by the Sellers in the Agreement are true and correct as of the date of the Agreement and as of the date of this Certificate.

April 30, 2009.

**SELLERS:**

**BURRILL NUTRACEUTICALS CAPITAL FUND, L.P.**
By Burrill & Company (Nutraceuticals GP), LLC

By: _____
Name:  G. Steven Burrill
Title:  Managing Member

POSCO BIOVENTURES I, L.P.

By:_____
Name:  Leo Kim
Title: _____

DSM VENTURING BV

By:_____
Name: _____
Title: _____

1

Case: 21-04040    Doc# 1    Filed: 11/08/21    Entered: 11/08/21 15:40:46    Page 76 of 121

FORAGEN TECHNOLOGIES LIMITED PARTNERSHIP

By:_____
Name:  Armand Lavoie
Title:_____

AURORA EQUITY LLC

By:_____
Name:  Jaleh Daie
Title:  Managing Partner

Pierluigi Zappacosta and Enrica D'Ettorre JTWROS

_____

UBS Paine Webber, Custodian for Mary C. Falvey, IRA

By:_____
Name: _____
Title: _____

_____
Mary Falvey, an individual

2

**EXHIBIT G**

**COPY OF INDEPENDENT ESTIMATE OF REAL ESTATE AND WINERY FACILITIES IN CAPALBIO, ITALY**

18

Case: 21-04040    Doc# 1    Filed: 11/08/21    Entered: 11/08/21 15:40:46    Page 78 of 121

Geom. Barbieri Alessandro
Via E. Berlinguer, 1 – 58010 Capalbio Scalo (GR)
Tel. 0564/89.87.70 - 339.21.92.040

# PERIZIA DI STIMA IMMOBILI AZIENDALI

## OGGETTO

Trattasi della valutazione di stima di terreni e fabbricati di un'azienda agricola ubicata nel comune di Capalbio (GR) in via Pedemontana n. 44, località Poggetti, di proprietà del sig. Crea Roberto.

L'azienda copre una superficie di circa venti ettari e si alterna tra i terreni del colle "Poggetti", dove sono impiantati gli oliveti, e i terreni semi pianeggianti ai piedi del colle che si allungano fino alla strada provinciale Pedemontana, dove troviamo i vigneti.

## PREMESSA

IL sottoscritto Geom. Barbieri Alessandro, nato a Roma il 16.09.1966, (C.F. BRB LSN 66P16 H501J), residente in Orbetello (GR), con studio in via Berlinguer n.1 58010 Capalbio Scalo (GR), iscritto all'albo dei Geometri della Provincia di Grosseto al n. 759, è stato incaricato dal sig. Crea Roberto di redigere la seguente perizia di stima inerente la propria azienda.

## INDIVIDUAZIONE CATASTALE e URBANISTICA

Gli immobili aziendali, terreni e fabbricati, sono censiti rispettivamente al N.C.T. e al N.C.E.U., del comune di Grosseto, comune censuario di Capalbio, al foglio 36, e precisamente :

- terreni impiantati a vigneto (1 classe) per ha 7,45,49 organizzati sulle particelle n. 200, 575, 105, e porzione della 729 ( ha 1,00) ;
- terreni impiantati a uliveto (3 classe) per ha 4,90,70 alle particelle 164, 170, 175, 574, 579 e 135;
- terreni destinati a seminativo (2 classe) per ha 7,90 alle particelle 728, 110, e porzione della particella 729 (ha 2,16) ;
- un piccolo bacino con pozzo per l'accumulo delle acque necessarie all'irrigazione, di ha 0,10 individuato alla particella 580 con la dizione di stagno ;
- un fabbricato abitativo a due piani, piano terra e primo censito alla particella 375 subalterno 6, categoria A/7, classe 5, consistenza 12 vani, superficie catastale 295 ;

- un fabbricato cantina e servizi organizzato su due piani, piano interrato e terra, censito alla particella 375 subalterno 7, categoria D/10 ;

- la corte dei fabbricati sistemata a giardino, con piscina, locale tecnico, strutture da ombra, gazebo, vialetti, recinzione in pietra, ecc....., censita alla particella 375 subalterno 5.

La legittimità urbanistica delle opere edilizie è rappresentata dalla concessione edilizia n.3813/99, la C. E. n. 4149/2000, la C. E. n. 5091/2003 la D.I.A. del 03.02.2004, l'accertamento di conformità del 21.07.2004.

Il fabbricato cantina ha autorizzazione sanitaria e di lavorazione comunale prot. 11030 del 26.08.2004.

Come destinazione urbanistica, tutti i terreni sono individuati come "zone territoriali omogenee E - sottozona E2 - aree agricole in aree protette" di cui all'art. 63 delle Norme Tecniche di Attuazione del Piano Regolatore Generale del comune di Capalbio.

Ovvero sono aree in cui sono consentiti tutti gli interventi di nuova edificazione necessari alla conduzione dell'azienda agricola, sia residenziale che non residenziale, e tutti gli interventi sul patrimonio edilizio esistente compresa la ristrutturazione, come previsto dalla L.R.T. n. 1/2005.

## DESCRIZIONE DEGLI IMMOBILI

### Fabbricato cantina

Il fabbricato cantina è un fabbricato di buona fattura in muratura classica intonacata e tinteggiata, con copertura a capanna realizzata con solaio latero cementizio e tegole, canali di gronda e discendenti in rame, infissi in legno, pavimenti in ceramica e legno.

Si articola su due piani, piano terra e interrato, con superficie di circa 200 mq lordi a piano, con altezza complessiva interna media di 6.20 ml., per un volume complessivo di circa 1450 mc, (compresa intercapedine).

Il piano interrato è sistemato all'interno di una scatola in cemento armato (pareti e platea), che gli permette di avere intercapedini di aerazione sia sui lati che sulla base, con accesso con rampa sempre in calcestruzzo armato rifinita con pavimentazione in pezzame di porfido.

Case: 21-04040   Doc# 1   Filed: 11/08/21   Entered: 11/08/21 15:40:46   Page 80 of 121

A piano terra è presente l'area di ricevimento e spremitura delle uve esterna di circa 60mq., coperta con una struttura in legno lamellare.

Il fabbricato si completa di impianto di aspirazione ed espulsione dell'anidride carbonica, impianto di refrigerazione dei tini vinicoli, impianto di climatizzazione degli ambienti uffici e sala di degustazione, impianto elettrico, idrico (acqua calda e fredda) e di fognatura.

### Fabbricato abitativo

Il fabbricato abitativo è un fabbricato di ottima fattura dove la muratura intonacata e tinteggiata si integra con la pietra, con copertura a falde latero cementizie rifinito a tegole, canali di gronda e discendenti in rame, infissi in legno, pavimentazioni in ceramica.

Si distribuisce su due piani, terra e primo, con superficie di circa 130 mq lordi a piano, con scala interna ed esterna, portici e verande di superficie lorda di circa 44 mq a piano, sottotetto, per un volume complessivo di circa 1230 mc.

La superficie perimetrale del piano terra è realizzata a doppia muratura in pietra quella esterna e in muratura di laterizio quella interna.

Le rifiniture esterne della muratura si alternano tra intonaco e pietra. Le verande e i portici hanno copertura con struttura portante in legno poggiante su archi e colonne in pietra. Camere, cucine, zone di soggiorno e bagni si alternano sia a piano terra che a piano primo.

Il fabbricato è completo di impianto di climatizzazione a termoconvettori, impianto di riscaldamento a radiatori con caldaia a gas, impianto citofonico, di allarme, elettrico, idrico e di fognatura.

### Corte dei fabbricati

La corte dei fabbricati è un giardino di circa 2.700 mq, (escludendo le superfici del fabbricato cantina e di quello abitativo), dove trovano posto tutte quelle strutture e i servizi a completamento delle dimore residenziali, dove la sistemazione delle aree varia in dipendenza del loro utilizzo.

Abbiamo aree sistemate a verde piantumate con varie essenze floreali, aree di manovra degli autoveicoli sistemate a ghiaia, camminamenti pavimentati in cotto o ceramica, area bordo piscina e solarium pavimentata in cotto, ecc....

Case: 21-04040   Doc# 1   Filed: 11/08/21   Entered: 11/08/21 15:40:46   Page 81 of 121

Nella corte troviamo l'area piscina di circa 230 mq, terrazzata e pavimentata, parte della quale è occupata da un gazebo di circa 52 mq con copertura in legno lamellare e tegole, poggiante su colonne in muratura con finitura in marmorino, con piscina di circa 45 mq ; un locale tecnico in muratura classica intonacata e tinteggiata di circa 23 mq, di cui una parte è adibito a servizi igienici per la piscina ; una struttura da ombra in legno lamellare di circa 40 mq adibita a parcheggio auto.

La corte è contornata da una recinzione in pietra di spessore di circa 50-60 cm, rifinita con ringhiere e cancelli in ferro lavorato, lunga circa 230 ml ed alta circa 2.90 ml, in ottima fattura, con aperture ad arco, alloggiamenti per fiori sulla sua sommità, e colonne ai cancelli.

L'area di corte è completata con impianto di irrigazione, elettrico, di illuminazione.

### Terreni

I terreni impiantati a oliveto si trovano sul colle dei "Poggetti", che costituisce una località molto caratteristica e rinomata del comune di Capalbio, e molto pittoresca, dal momento che è tutta impiantata ad olivi, su colori di terreno variabili al variare della loro consistenza, con piante corpose che hanno una ragguardevole età di circa cento anni, che offrono ancora una buona produzione di olio sia per qualità che per quantità.

I terreni impiantati a vigneto sono in una posizione semi-collinare con proprietà chimico fisiche molto favorevoli per la produzione di vino. Sono costituiti prevalentemente da un detrito argilloso-sabbioso con ciottoli derivante dalla disgregazione di una formazione conglomeratica.

### VALUTAZIONE DI STIMA

Si intende valutare i beni in oggetto, secondo il più probabile valore di mercato che questi possono avere in caso di compravendita, eseguendo, ove possibile, una stima per confronto diretto o comparativa ; ovvero confrontando i beni con altri similari che sono stati oggetto di recenti compravendite sul mercato immobiliare di Capalbio.

Per quei beni per i quali non è possibile eseguire una stima comparativa come premesso, eseguiremo una valutazione di stima come di seguito indicato :

Case: 21-04040    Doc# 1    Filed: 11/08/21    Entered: 11/08/21 15:40:46    Page 82 of
121

– per le opere edilizie o fabbricati, considereremo un loro eventuale prezzo di acquisto, aggiungendo i costi che ad oggi si dovrebbero sostenere per la loro ristrutturazione, o la nuova edificazione, più la realizzazione di un utile di investimento, un interesse sui capitali investiti ;

– per i terreni (vigneti o oliveti), considereremo il prezzo di acquisto di un seminativo semplice, aggiungendo tutte quelle spese necessarie all'impianto delle colture, (comprese le spese per i diritti di impianto nel caso dei vigneti), più la realizzazione di un utile di investimento, un interesse sui capitali investiti.

In base a quanto premesso e considerato abbiamo stimato i seguenti valori :

| | | |
|---|---|---|
| terreni a seminativo semplice | ha 07,90,00 x 60.000 €/ha = | € 474.000,00 |
| terreni impiantati a vigneto | ha 07,45,49 x 150.000 €/ha = | € 1.118.000,00 |
| terreni impiantati a oliveto | ha 04,90,70 x 80.000 €/ha = | € 393.000,00 |
| fabbricato abitativo | | |
| superficie abitativa lorda | mq 260 x 9.000 €/mq = | € 2.340.000,00 |
| superficie verande e portici | mq 88 x 5.000 €/mq = | € 440.000,00 |
| fabbricato cantina | mc 1450 x 1.000 €/mc = | € 1.450.000,00 |
| corte e opere incluse | mq 2.700 x 300 €/mq = | € 810.000,00 |
| | totale | € 7.025.000,00 |

Si può concludere con un valore complessivo dell'azienda di circa € 7.000.000,00 (settemilioni di euro).

Case: 21-04040    Doc# 1    Filed: 11/08/21    Entered: 11/08/21 15:40:46    Page 83 of 121

Geom. Barbieri Alessandro
Via E. Berlinguer, 1 – 58010 Capalbio Scalo (GR)
Tel. 0564/89.87.70 – 339.21.92.040

## PRECISAZIONI

Le valutazioni riportate sono fatte considerando che tutta l'azienda, fabbricati e terreni, sono in ottimo stato di manutenzione.

La valutazione del bacino di raccolta delle acque con il pozzo, individuato alla particella 580, essendo cosa modesta, la riteniamo compresa nei valori espressi per i terreni.

Negli ultimi anni è sempre cresciuta la richiesta di terreni e fabbricati nel comune di Capalbio, vuoi per motivi turistici, o mondani, o di investimento sicuro.

Come sono cresciuti i costi delle opere edilizie, dovuto all'aumento del petrolio, della manodopera, e all'aggiornamento delle normative in materia sismica, acustica e termica.

Tutto ciò ha comportato e comporta naturalmente la crescita dei valori immobiliari.

Per la particella 105 è in corso la pratica di variazione colturale presso gli uffici tecnici erariali di Grosseto.

Si allega alla presente :

visure e planimetria catastale ;

stralcio di piano regolatore generale e relative norme tecniche di attuazione.

Data lì, 19-09-2008

Il Tecnico
Geom. Barbieri Alessandro

Case: 21-04040   Doc# 1   Filed: 11/08/21   Entered: 11/08/21 15:40:46   Page 84 of 121

# EXHIBIT D

## Sale of Assets to Secured Creditor

This Sale of Assets to Secured Creditor (the **"Agreement"**) is entered into as of December 17th, 2018, by and between Dr. Roberto Crea (the **"Buyer"**) and CreAgri, Inc., a California corporation (the **"Seller"**).

## RECITALS

A.   In or about 2002, Seller sought and received investments from numerous different parties in exchange for the issuance of certain Series A Preferred Shares;

B.   Between 2004 and 2008, the Seller issued promissory notes payable to the same parties that earlier received Series A Preferred Shares (collectively, the **"Notes"** and individually the **"2004 Notes"** and the **"2008 Notes"**). The Notes were authorized to be secured against Seller's assets. The Notes consist of $2,000,000 worth of notes issued on or about February 17, 2004 and $979,498.60 issued on or about May 1, 2008;

C.   On April 10, 2009, Sellers approved a transaction whereby the Buyer purchased all of the Series A Preferred Shares and the Notes through a Stock and Notes Purchase and Sale Agreement dated April 30, 2009.

D.   As of April 30, 2009, the Seller was in default under the Notes and continues to be in default under the Notes.

E.   On August 31, 2015, a UCC-1 Financing Statement with the California Secretary of State's office as Document No. 50766160002 securing all of the 2008 Notes a copy of which is attached as Exhibit A (the UCC-1).

E.   The parties desire to avoid the time, costs, and fees to all parties associated with a formal foreclosure by entering into this Agreement.

Now, therefore, for the consideration set forth below, the parties agree as follows:

1.   **Agreed Value of 2008 Notes.**

The parties to this Agreement agree that the Seller has not paid any amount towards the Notes. The Notes have their full principal value of $2,000,000 for the 2004 Notes and $979,498.60 for the 2008 Notes. The 2008 Notes have accrued interest in the amount of $1,199,479.44 through December 14, 2018. The parties further agree and recognize that the full value of the 2008 Notes are secured against all of Seller's assets by way of the UCC-1.

2.   **Assets to be Sold**

Upon the terms and subject to the conditions set forth in this Agreement, Seller shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase and acquire

Case: 21-04040   Doc# 1   Filed: 11/08/21   Entered: 11/08/21 15:40:46   Page 86 of 121

from Seller, all of Seller's right, title and interest in and to Seller's property and assets, real, personal or mixed, tangible and intangible, as set forth:

(a) all Tangible personal property, including but not limited to those items described in Exhibit B;

(b) all data and records related to the operations of Seller and in Seller's possession as of the Closing Date, including research and development reports and records, production reports and records, service and warranty records, equipment logs, operating guides and manuals, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and records and, subject to legal requirements, copies of all personnel records and other records (collectively the "**Records**");

(c) all patents, trademarks, and copyrights described in Exhibit C;

(d) all the following intangible rights and property of Seller: product designs, whether recorded in computer or paper formats, customer lists and contact information, supplier lists and contact information, electronic product catalogs and records, customer contracts, and all production records.

All of the property and assets to be transferred to Buyer are referred to collectively as the "**Assets**." Notwithstanding the foregoing, the transfer of the Assets pursuant to this Agreement shall not include the assumption of any liability related to the Assets.

3. **Value of Seller's Assets.**

In or about August 2018 Seller received an offer from Renovo, S.p.A. for $1,750,000 for all of Seller's assets. Seller accepted the offer and executed an agreement (the Renovo Agreement), but Renovo defaulted in their first payment. After several attempts by Seller to collect, Seller cancelled the agreement. Due to the continued deterioration of Seller's business and the legal action taken and threatened by Seller's creditors, Seller agrees that its assets are worth less than the full value of principal and interest due under the 2008 Notes.

4. **Consideration for Assets.**

The consideration for the Assets is $2,178,978.04, which is the full value of what is owed to Buyer for principal and accrued interest under the 2008 Notes.

5. **Closing Obligations.**

In addition to any other documents to be delivered under other provisions of this Agreement, at the Closing:

5.1 Seller shall deliver to Buyer:

Case: 21-04040   Doc# 1   Filed: 11/08/21   Entered: 11/08/21 15:40:46   Page 87 of 121

**5.1.1** a bill of sale for all of the Assets that are Tangible Personal Property in the form of <u>Exhibit D</u> (the "**Bill of Sale**") executed by Seller;

**5.1.2** such other deeds, bills of sale, assignments, certificates of title, documents and other instruments of transfer and conveyance as may reasonably be requested by Buyer, each in form and substance reasonably satisfactory to Buyer and Seller and their respective legal counsel, and executed by Seller.

**5.2** Buyer shall deliver to Seller:

**5.2.1** all original 2008 Notes marked "Paid in Full."

**5.2.2** a release of the UCC-1 Financing Statement

## 6. Seller's Representations

Seller warrants, to Buyer as follows:

**6.1** **Organization and Good Standing**. Seller is a corporation duly organized, validly existing and in good standing under the laws of the State of California, with full corporate power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all its obligations. Seller is duly qualified to do business as a foreign corporation and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification.

**6.2** **Enforceability; Authority; No Conflict**.

**6.2.1** This Agreement constitutes Seller's legal, valid and binding obligation, enforceable against it in accordance with its terms. Upon the execution and delivery by Seller of each agreement to be executed or delivered by any or all of Seller, each of Seller's documents will constitute the legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms. Seller has the absolute and unrestricted right, power and authority to execute and deliver this Agreement to which it is a party and to perform its obligations under this Agreement, and such action has been duly authorized by all necessary action by the Shareholders and Seller's disinterested directors.

**6.2.2** The execution and delivery of this Agreement will not, and its consummation or performance will not, directly or indirectly (with or without notice or lapse of time):

(a) breach any provision of any of the governing documents of Seller or any resolution adopted by Seller's board of directors or Seller's shareholders;

Case: 21-04040    Doc# 1    Filed: 11/08/21    Entered: 11/08/21 15:40:46    Page 88 of 121

(b)     violate any law, order or regulation of any governmental body, or give any governmental body or other person the right to challenge the Agreement or to exercise any remedy or obtain any relief under any legal requirement or any order to which Seller, or any of the Assets, may be subject;

(c)     contravene, conflict with, or result in a violation or breach of any of the terms or requirements of, or give any governmental body the right to revoke, withdraw, suspend, cancel, terminate or modify, any governmental authorization that is held by Seller or that otherwise relates to the Assets;

(d)     breach any provision of, or give any person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or payment under, or to cancel, terminate or modify, any Seller contracts; or

(e)     result in the imposition or creation of any encumbrance upon or with respect to any of the Assets.

**6.2.3** Seller is not required to give any notice to, or obtain any consent from, any person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Agreement.

### 6.3     Title to Assets; Encumbrances.

Seller has exclusive, good and transferable title to all of the Assets free and clear of any mortgage, pledge, security interest, lien or encumbrance. Seller warrants to Buyer that all of the Assets shall be free and clear of any mortgage, pledge, security interest, lien and encumbrance.

### 6.4     Usury

At the time Seller issued the 2004 Notes and the 2008 Notes, Seller had more than $2,000,000 in assets on its then most recent financial statement and qualified for an exemption from California's usury laws under Corporations Code §25118. The Notes were exempt from California's usury law, set forth in Article XV Section 1 of the California Constitution

### 6.5     Intellectual Property.

**6.5.1** "**Intellectual Property**" means all of the following in any jurisdiction throughout the world: (a) all inventions (whether patentable or unpatentable and whether or not reduced to practice), all improvements thereto, and all patents, patent applications, and patent disclosures, together with all reissuances, continuations, continuations-in-part, revisions, extensions, and reexaminations thereof; (b) all trademarks, service marks, trade dress, logos, slogans, trade names, corporate names, and rights in telephone numbers (except as otherwise specifically described herein), together with all translations, adaptations, derivations, and combinations thereof and including all goodwill

Page 4 of 12

associated therewith, and all applications, registrations, and renewals in connection therewith; (c) all copyrightable works, all copyrights, and all applications, registrations, and renewals in connection therewith; (d) all mask works and all applications, registrations, and renewals in connection therewith; (e) all trade secrets and confidential business information (including ideas, research and development, know-how, formulas, compositions, manufacturing and production processes and techniques, technical data, designs, drawings, specifications, customer and supplier lists, pricing and cost information, and business and marketing plans and proposals); (f) all computer software (including source code, executable code, data, databases, and related documentation); (g) all material advertising and promotional materials; (h) all domain names and rights thereto; (i) all other proprietary rights; and (j) all copies and tangible embodiments of any of the foregoing (in whatever form or medium).

**6.5.2** <u>Right To Use</u>. Seller owns and possesses all Intellectual Property used in or held for use in Seller's operation as it is currently conducted. Each item of Intellectual Property owned, used or held for use by Seller immediately prior to the Closing will be owned by Buyer on identical terms and conditions immediately following the Closing. Seller has taken all reasonably necessary action to maintain and protect each item of Intellectual Property that it owns, uses or holds for use.

**6.5.3** <u>Non-Interference</u>. Seller has not interfered with, infringed upon, misappropriated, or violated any Intellectual Property rights of any Person, and neither Seller, nor any of Seller's, directors, officers or employees has received any charge, complaint, claim, demand, or notice alleging any such interference, infringement, misappropriation, or violation (including any notice that Seller must license or refrain from using any Intellectual Property rights of any Person). To Seller's knowledge, no person has interfered with, infringed upon, misappropriated, or violated any Intellectual Property rights of Seller in any respect.

**6.5.4** <u>Patents</u>. <u>Exhibit C</u> identifies each patent and registration that has been issued to Seller with respect to its Intellectual Property, identifies each pending patent application and application for registration that Seller has made with respect to its Intellectual Property, and identifies each license, sublicense, agreement, and other permission that Seller has granted to any person with respect to its Intellectual Property (together with any exceptions thereto). Seller has delivered to Buyer true, complete and correct copies of all such patents, registrations, applications, licenses, sublicenses, agreements, and permissions (as amended to date). <u>Exhibit C</u> also identifies each trade name, unregistered trademark, service mark, corporate name, Internet domain name, and copyright used by Seller. With respect to each item of Intellectual Property required to be identified on <u>Exhibit C</u>: (a) Seller possesses all right, title, and interest in and to the item, free and clear of all Liens, licenses, and other restrictions; (b) the item is not subject to any outstanding injunction, judgment, order, decree, ruling, or charge; (c) no action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand is pending or, to Seller's knowledge, is threatened, that challenges the legality, validity, enforceability, use, or ownership of the item; (d) the item is able to be freely assigned and transferred to

Buyer; and (e) Seller has not agreed to indemnify any person for or against any interference, infringement, misappropriation, or other conflict with respect to the item.

6.5.5 Work for Hire. All inventions, discoveries, trade secrets and works, whether or not patented or patentable or otherwise protectable under law, created, prepared, developed or conceived by Seller's employees are the exclusive property of Seller and were either created, prepared, developed or conceived by (i) Seller's employees within the scope of their employment; or (ii) by independent contractors who have duly assigned their rights to Seller pursuant to enforceable written agreements.

6.5.6 Protection. Seller has taken all reasonable steps in accordance with normal industry practice to protect the Intellectual Property, including all rights in confidential information and trade secrets. Except pursuant to enforceable confidentiality obligation in favor of Seller, there has been no disclosure of any confidential information or trade secrets included in Intellectual Property. To Seller's Knowledge, no current or former employee, consultant, contractor or potential investor of Seller is in unauthorized possession of any of the confidential information or trade secrets included in Intellectual Property.

### 6.6 Solvency

Seller is currently unable to able to pay its debts as they become due. No transfer of property is being made and no obligation is being incurred in connection with the contemplated transactions herein with the intent to hinder, delay or defraud either Seller's present or future creditors. Seller recognizes that Buyer is a secured creditor with rights in all assets up to the full value of the 2008 Notes and has a right to foreclose on the assets at any time.

### 7. Effect of Headings.



The subject headings of the paragraphs and subparagraphs of this Agreement are included for convenience only and will not affect the construction or interpretation of any of its provisions.

### 8. Entire Agreement, Modification, and Waiver.

This Agreement constitutes the entire agreement between the parties pertaining to the subject matter contained in it and supersedes all prior and contemporaneous agreements, representations, and understandings of the parties. No supplement, modification, or amendment of this Agreement will be binding unless executed in writing by all the parties. No waiver of any of the provisions of this Agreement will constitute a waiver of any other provision, whether or not similar, nor will any waiver constitute a continuing waiver. No waiver will be binding unless executed in writing by the party making the waiver.

Case: 21-04040   Doc# 1   Filed: 11/08/21   Entered: 11/08/21 15:40:46   Page 91 of 121

**9. Ambiguities.**

Each party and its counsel, if desired, have participated fully in the review and revision of this Agreement. Any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not apply in interpreting this Agreement.

**10. Attorneys' Fees and Costs.**

Should it become necessary for any Party to this Agreement to secure legal counsel to enforce the terms of this Agreement, or to maintain or defend any cause of action arising out of or related to this Agreement, the substantially prevailing Party shall be entitled to reasonable attorneys' fees and costs and expenses from the substantially non-prevailing Party.

**11. Governing Law.**

This Agreement will be construed in accordance with, and governed by, the laws of the State of California as applied to contracts that are executed and performed entirely in California.

**12. Severability.**

If any provision of this Agreement is held invalid or unenforceable by any court of final jurisdiction, it is the intent of the parties that all other provisions of this Agreement be construed to remain fully valid, enforceable, and binding on the parties.

**13. Execution of Agreement.**

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by facsimile transmission or electronic mail transmission shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes. Signatures of the Parties transmitted by facsimile or email shall be deemed to be their original signatures for all purposes.

*(Signature page follows)*

Case: 21-04040    Doc# 1    Filed: 11/08/21    Entered: 11/08/21 15:40:46    Page 92 of 121

## SIGNATURE PAGE

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

Buyer:

Dr. Roberto Crea

Seller:

CreAgri, Inc.

By: Anthony DeLio
Its: Chairman of the Board

**Exhibit A**

UCC-1 Financing Statement, Document No. 50766160002

**Exhibit B**

The following Tangible personal property is included in this sale:

**Exhibit C**

The following patents, trademarks, and copyrights are included in this sale

*ℛ*

**Exhibit D.**

**BILL OF SALE**

THIS BILL OF SALE (this "Bill of Sale") dated December 17, 2018, is by CreAgri, Inc., a California corporation ("Seller"), for the benefit of Dr. Roberto Crea ("Buyer"), pursuant to that certain Sale of Assets to Secured Creditor December 17, 2018, by and among Seller and Buyer, (the "Agreement"). Capitalized terms used in this Bill of Sale without definition will have the respective meanings given to them in the Agreement.

The Agreement provides, among other things, for the sale of the Assets from Seller to Buyer. This Bill of Sale is made and delivered in accordance with the Agreement to make effective the transfer and conveyance of the Assets from Seller to Buyer.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are acknowledged, Seller transfers and conveys to Buyer, and its successors and assigns, all of Seller's rights, title, and interests in and to the Assets, free and clear of all encumbrances; with said transfer and conveyance to be effective as of 5:00 p.m. of the date first mentioned above.

Nothing contained in this Bill of Sale will in any way supersede, modify, amend, waive or otherwise affect any of the provisions set forth in the Agreement, including without limitation any of the representations, warranties, covenants, and agreements set forth therein, this Bill of Sale being intended only to give effect to the transfer and conveyance by Seller to Buyer of the Assets owned by Seller pursuant to the Agreement. This Bill of Sale will be governed by and construed in accordance with the laws of the State of California, without regard to conflicts of law or choice of law principles.

Seller has executed this Bill of Sale as of the date first above written.

CreAgri, Inc.

By: _____

By: Anthony DeLio
Its: Chairman of the Board

Case: 21-04040    Doc# 1    Filed: 11/08/21    Entered: 11/08/21 15:40:46    Page 97 of 121

# EXHIBIT E

## TRANSFER

FOR GOOD AND VALUABLE CONSIDERATION, the receipt and sufficiency of which is hereby acknowledged and agreed, the undersigned hereby sells, assigns and transfers unto Caliscana, LLC the patents, trade-marks and inventory identified on Schedules 'A', 'B' and 'C' appended hereto and assigns all right, title and interest in and to those agreements identified on Schedule 'D' appended hereto.

**DATED** as of the 7th day of January, 2019.

_____
ROBERTO CREA

## Schedule 'A'

## (Patents)

**Australia**

Patent no.          746712 (August 15, 2002*)

60230535 (August 9, 2007)

2003249719 (June 18, 2010)

2008249142 (August 16, 2012)

2006269843 (April 26, 2013)

**Canada**

Patent no.          2,420,893 (November 22, 2011)

2,474,798 (December 4, 2012)

**Europe**

Patent no.          1098573 (June 23, 2004)

1315691 (August 15, 2012)

1924269 (March 11, 2015)

**Greece**

Patent no.          3050066 (August 31, 2004)

**Mexico**

Patent no.          228306 (June 6, 2005)

**United States**

Patent
Application no.    6165475 (December 26, 2000)

6197308 (March 6, 2001)

6936287 (August 30, 2005)

7261909 (August 28, 2007)

7713569 (May 11, 2010)

8263142 (September 11, 2012)

9789149 (October 17, 2017)

62442360 (filed on January 4, 2017)

62/448208 (filed on January 19, 2017)

\* All dates refer to the date of the grant unless otherwise specified.

## Schedule 'B'

## (Trade-marks)

**China**

Registration no.     19278735 (Hidrox)

**Europe**

Registration no.     014579783 (Hidrox)

**Japan**

Registration no.     5849226 (Hidrox)
                     5849225 (Olivenol)

**United States of America**

Registration no.     4123953 (Hidrox)

## Schedule 'C'

### (Inventory)

| | |
|---|---|
| Hidrox 0.5% Liquid | 750,000 litres |
| Hidrox 10X Liquid | 3,095 litres |
| Hidrox 12% Powder | 101 kgs |
| Hidrox 6% | 20 kgs |
| Essence Olivenol Plus | 8 24-packs |
| Easeflex Olivenol Plus | 1 24-pack |

1.  Supply Agreement entered into between CreAgri, Inc. and Sunsweet Growers Inc. as of September 1, 2012

2.  Distribution Agreement entered into between CreAgri, Inc. and Pharmachem S.A. DE C.V. as of August 8, 2013

3.  Distributor Agreement entered into between CreAgri, Inc. and Eurochem Feinchemie GmbH as of January 2, 2014

4.  Licensed Reseller Supply Agreement entered into between CreAgri, Inc. and H&S Solutions Limited as of May 1, 2014

5.  Exclusive Distribution Agreement entered into between CreAgri, Inc. and Health Korea Inc. as of May 1, 2014

6.  Representative Services Agreement entered into between CreAgri, Inc. and Mr. Makoto Takahashi as of August 1, 2014

7.  Contract № 15-20/643-840 entered into between CreAgri, Inc. and Pharmstandard LLC as of April 20, 2015

8.  Distribution Agreement entered into between CreAgri, Inc. and BU8 Sdn. Bhd as of December 30, 2016

9.  OLIVENOL™ and OLIVENOL PLUS™ Distributor Agreement entered into between CreAgri, Inc. and Holistic Solutions, Ltd. as of August 17, 2017

10. Distributorship & License Agreement entered into between CreAgri, Inc. and AIDE Co., Ltd. as of May 1, 2018



# ASSIGNMENT

For good and valuable consideration, the receipt of which is hereby acknowledged, we, the undersigned, Roberto Crea (the "Assignor"), sell, assign, and transfer to Caliscana, LLC, with offices at 1205 Lakeview Drive, Hillsborough, CA ("Assignee"), and his successors, assigns, and legal representatives, the entire right, title and interest for the United States and all foreign countries, in and to any and all improvements which are disclosed in the United States and Foreign patents and patent applications listed in the attached Schedule A, and in any patent action relative to said patents and patent applications and all utility, divisional, continuing, substitute, renewal, reissue, and all other patents and patent applications which have been or shall be filed in the United States and all foreign countries on any of said improvements; and in and to all original and reissued patents which have been or shall be issued in the United States and all foreign countries on said improvements; and in and to all rights of priority resulting from the filing of said United States patents and patent applications; and the right to sue third parties and retain damages for patent infringement based on activities occurring on, prior to and after the execution date hereof, including but not limited to all rights to recover damages for infringement of provisional rights.

The Assignor agrees that said Assignee may apply for and receive patents for said improvements in its own name; and that, when requested, without charge to, but at the expense of, said Assignee, its successors, assigns and legal representatives, to carry out in good faith the intent and purpose of this Assignment, the undersigned will execute all divisional, continuing, substitute, renewal, reissue, and all other patent applications on any and all said improvements; execute all rightful oaths, assignments, powers of attorney and other papers; communicate to said Assignee, its successors, assigns, and representatives, all facts known to the undersigned relating to said improvements and the history thereof; and generally do everything possible which said Assignee, its

Case: 21-04040   Doc# 1   Filed: 11/08/21   Entered: 11/08/21 15:40:46   Page 104 of 121

successors, assigns or representatives shall consider desirable for aiding in securing and maintaining proper patent protection for said improvements and for vesting title to said improvements and all applications for patents and all patents on said improvements, in said Assignee, its successors, assigns and legal representatives.

Assignor represents and warrants to Assignee, its successors, assigns and legal representatives that no assignment, grant, mortgage, license or other agreement affecting the rights and property herein conveyed has been made to others by the undersigned, and that full right to convey the same as herein expressed is possessed by the undersigned.

Date: JAN. 15, 2019          Name: _____

**Roberto Crea**
**Assignor**

**Australia**

Patent no. 746712 (August 15, 2002*)

60230535 (August 9, 2007)

2003249719 (June 18, 2010)

2008249142 (August 16, 2012)

2006269843 (April 26, 2013)

**Canada**

Patent no. 2,420,893 (November 22, 2011)

2,474,798 (December 4, 2012)

**Europe**

Patent no. 1098573 (June 23, 2004)

1315691 (August 15, 2012)

1924269 (March 11, 2015)

**Greece**

Patent no. 3050066 (August 31, 2004)

**Mexico**

Patent no. 228306 (June 6, 2005)

**United States**

Patent
Application no. 6165475 (December 26, 2000)

6197308 (March 6, 2001)

6936287 (August 30, 2005)

7261909 (August 28, 2007)

7713569 (May 11, 2010)

8263142 (September 11, 2012)

9789149 (October 17, 2017)

62442360 (filed on January 4, 2017)

62/448208 (filed on January 19, 2017)

* All dates refer to the date of the grant unless otherwise specified.

# EXHIBIT F

This Asset Purchase Agreement is made as of the _21_ day of January, 2019 (the **"Agreement"**)
AMONG:

> OLIPHENOL LLC, a limited liability company organized under the laws of the State of Delaware
>
> (the **"Purchaser"**)
>
> - and -
>
> Calsicana, LLC, a limited liability company organized under the laws of the State of California
>
> (the **"Vendor"**)
>
> DR. ROBERTO CREA. an individual residing at 1205 Lakeview Drive, Hillsborough California
>
> (the **"Member"**)

### Recitals

WHEREAS the Vendor owns certain patents, patent applications, trademarks and inventory relating to the manufacture and supply of phenols derived from olives and is party to certain agreements for the storage and distribution thereof;

AND WHEREAS the Vendor has agreed to sell and assign, and the Purchaser has agreed to purchase and assume, the aforementioned assets and agreements;

AND WHEREAS the Member is indirectly indebted to 2199933 Ontario Inc., being a company wholly owned by Raymond Chyc, in the amount of two hundred and fifty thousand dollars ($250,000.00) together with applicable interest thereon, if any, (the **"Debt"**), and Raymond Chyc and the Member indirectly hold membership interests in the Purchaser;

NOW THEREFORE THIS AGREEMENT WITNESSETH that in consideration of the premises and the terms and conditions herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

### ARTICLE 1
### DEFINITIONS AND INTERPRETATION

1.1     As used in this Agreement:

(a)     **"Assets"** means the Inventory, Patents, and TradeMarks;

(b)     **"Business"** means the manufacture and worldwide distribution and sale of phenols derived from olives and the marketing thereof as carried on, directly or indirectly, by the Member through a prior entity known as CreAgri, Inc.;

(c)     **"Closing Date"** has the meaning ascribed thereto in section 2.1, below;

(d)     **"Debt"** has the meaning ascribed thereto in the third recital, above;

(e)     **"Distribution Agreements"** means those agreements identified in Schedule 'D' appended hereto;

(f) **"Encumbrance"** means pledges, liens, charges, security interests, leases, title retention agreements, deeds of trust, restrictions or similar agreements or adverse claims of any kind or character whatsoever;

(g) **"Intellectual Property Right"** includes without limitation: (i) Common Law and statutory rights relating to U.S. and foreign issued patents (including utility models and design patents) and applications therefor and all reissues, divisions, re-examinations, renewals, extensions, provisionals, continuations and continuations-in-part thereof; (ii) trade-marks, trade names, logos, service marks and other indicia of origin, and related goodwill, including any registrations and applications therefor; (iii) copyright, including copyright registrations and applications therefor, and any moral right thereto; and (iv) know how;

(h) **"Inventory"** means the goods identified in Schedule 'C' appended hereto;

(i) **"Patents"** means the Common Law and statutory rights relating to U.S. and foreign issued patents (including utility models and design patents) and applications therefor and all reissues, divisions, re-examinations, renewals, extensions, provisionals, continuations and continuations-in-part thereof identified in Schedule 'A' appended hereto;

(j) **"Purchase Price"** has the meaning ascribed thereto in section 2.2, below;

(k) **"Storage Agreement"** means the agreement entered into between D.P. Enterprises, LP, a limited liability partnership organized under the laws of the State of California, and CreAgri, Inc., a corporation organized under the laws of the State of California, as of the 18th day of July, 2017;

(l) **"Time of Closing"** has the meaning ascribed thereto in section 2.6, below;

(m) **"Trademarks"** means the trademarks, trade names, logos, service marks and other indicia of origin, and related goodwill, including any registrations and applications therefor identified in Schedule 'B' appended hereto; and

(n) **"Website"** means the (i) domain name "www.creagri.com"; (ii) the website associated with such domain name including all sub-pages and, without limitation, the architecture thereof, all text, graphics, photographs and hyperlinks displayed thereon and all product ordering, payment processing and communication functions thereof, if any; and, (iii) all Intellectual Property Rights associated with the foregoing and each element thereof.

1.2 The division of this Agreement into articles and sections is for convenience of reference only and shall not affect the interpretation or construction of this Agreement.

1.3 All words and personal pronouns relating thereto shall be read and construed as the number and gender of the party or parties referred to in each case require and the verb shall be construed as agreeing with the required word and pronoun.

## ARTICLE 2
## PURCHASE AND SALE

2.1 Subject to the terms and conditions hereof, the Vendor shall sell and assign and the Purchaser shall purchase and assume the Assets as of the date hereof (the **"Closing Date"**).

2.2 The purchase price shall be one million, seven hundred and fifty thousand dollars ($1,750,000.00) (the **"Purchase Price"**), which the parties acknowledge and agree to be the fair market value thereof.

2/12

Case: 21-04040    Doc# 1    Filed: 11/08/21    Entered: 11/08/21 15:40:46    Page 109 of 121

2.3    Subject to section 2.4, below, the Purchaser shall satisfy payment of the Purchase Price as follows:

(a)    the Debt shall be offset against the Purchase Price so that the Debt is paid in full as of the closing of the transaction of purchase and sale contemplated by the Agreement and the Purchase Price is reduced accordingly;

(b)    five hundred thousand dollars ($500,000.00) shall be due and payable on the 1st day of March, 2019; and

(c)    the balance shall be due and payable on the 15th day of December, 2019;

all such payments to be made by certified cheque or by wire transfer into such account as the Vendor directs in advance and in writing.

2.4    Those payments due in March and December, 2019, pursuant to subsections 2.3 (b) and (c), above, shall be contingent upon the Vendor having first provided to the Purchaser written evidence in such form as the Purchaser may reasonably require to establish that the Vendor has taken all necessary and desirable steps to assign all of the Assets to the Purchaser.

2.5    The Purchase Price shall be allocated among the classes of Assets as follows and the Vendor and Purchaser shall ensure that their tax filings are consistent therewith:

(a)    Inventory:            $762,085.00;

(b)    Patents:             $986,915.00;

(c)    Trade-marks:         $1,000.00; and

2.6    The following payment and deliveries shall be made no later than 2:00 p.m. on Closing Date (the **"Time of Closing"**):

(a)    Raymond Chyc shall deliver to the Vendor the promissory note evidencing the "Debt". which shall be stamped "Paid", and to take all such steps as the Vendor and Member may reasonably require to terminate all registrations of security interests in respect thereof;

(b)    the Vendor shall deliver the following to the office of the Purchaser's counsel, Sorbara, Schumacher, McCann LLP, each as duly executed by the Vendor and in a form acceptable to the Purchaser's legal counsel:

(i)    a form transferring to the Purchaser all right, title and interest in and to the Patents;

(ii)    a form transferring to the Purchaser all right, title and interest in and to the Trade-marks;

(iii)    a bill of sale transferring to the Purchaser all right, title and interest in and to the Inventory.

(iv)    proof of a valid California Sellers Permit and any documentation necessary to exempt the sale from California sales taxes.

(c)    The Purchaser shall deliver the following to the office of the Vendor's counsel, Law Offices of David S. Pearson, each as duly executed by the Purchaser and in a form acceptable to the Vendor's legal counsel:

(i)    A note for $1,500,000;

(ii)    proof of a valid California Sellers Permit and any documentation necessary to exempt the sale from California sales taxes.

2.7    Each of the parties shall execute and deliver in a timely manner all such further documents and do all such other things as the other may reasonably request to give full effect to this Agreement.

3/12

2.8 Member agrees to use his best efforts to obtain assignments or enter into new agreements with the third parties for all Distribution Agreements, Storage Agreements and to obtain assignment or purchase of the Website. The parties recognize that neither Vendor nor Member own or have a right to assign the Distribution Agreements, Storage Agreements and Website and that the Distribution Agreements and Storage Agreements contain provisions specifically disallowing assignment.

## ARTICLE 3
### REPRESENTATIONS AND WARRANTIES

3.1 The Purchaser represents and warrants to the Vendor and Member that, as of the Closing Date:

    (a) the Purchaser is organized and subsisting under the laws of the State of Delaware;

    (b) the execution and delivery of this Agreement by the Purchaser have been authorized by all necessary action and the Purchaser has all power and authority to enter into this Agreement and to carry out the transactions contemplated herein; and

    (c) this Agreement shall not constitute a default of any other agreement to which Purchaser is subject nor does any such agreement exist that would restrict or prohibit the within transactions.

3.2 The Vendor represents and warrants to the Purchaser that, as of the Closing Date:

    (a) Vendor is organized and subsisting under the laws of the State of California;

    (b) the Vendor owns the Assets with good and marketable title thereto free and clear of all Encumbrances; for greater certainty, CreAgri, Inc. duly sold to Member all of CreAgri, Inc.'s right title and interest in and to the inventory, patents and trademarks as of December 17, 2018 and Member contributed all Assets to the Vendor as of January 7, 2019;

    (c) the Vendor is entitled to sell, transfer and assign to the Purchaser good and marketable title to the Assets free and clear of all Encumbrances;

    (d) this Agreement shall not constitute a default of any other agreement to which Vendor is subject nor does any such agreement exist that would restrict or prohibit the within transactions.;

    (e) there is no order, injunction, decree, statute, rule, regulation, agreement or other instrument binding upon the Vendor that will be violated by the execution and delivery of this Agreement or will prevent the performance or satisfaction by the Vendor of any term or condition of this Agreement;

    (f) schedule 'A' appended hereto contains a complete and accurate list of all Common Law and statutory rights relating to U.S. and foreign issued patents relating to the Assets or otherwise to the Business (including utility models and design patents) and applications therefor and all reissues, divisions, re-examinations, renewals, extensions, provisionals, continuations and continuations-in-part thereof;

    (g) schedule 'B' appended hereto contains a complete and accurate list of all trade-marks, trade names, logos, service marks and other indicia of origin and related goodwill relating to the Assets or otherwise to the Business, including any registrations and applications therefor;

    (h) schedule 'C' appended hereto contains a complete and accurate list of all inventory relating to the Business;

4/14

(i)    schedule 'D' appended hereto contains a complete and accurate list of all distribution agreements of which Member is aware and which relate to the Business;

(j)    neither the Vendor nor any other entity holds any copyright, including copyright registrations and applications therefor, or any moral right thereto, in or in respect of any of the Assets or otherwise in or in respect of the Business;

(k)    no third party has any right, title or interest, whether present or future, absolute or contingent, in or to any Intellectual Property Right with respect to any of the Assets or otherwise with respect to the Business;

(l)    each of the Patents and Trademarks is valid and subsisting and all registration, maintenance and renewal fees in respect thereof have been paid and all necessary documents in connection therewith have been filed with the relevant authority of each applicable jurisdiction for the purposes of prosecuting, perfecting and maintaining the Patents and Trade-marks in the name of the Vendor;

(m)    To the best of Vendor's knowledge, no facts or circumstances exist that would render any of the Patents invalid or unenforceable, or that would materially affect the likelihood of any pending application maturing to registration; the Vendor has not misrepresented, or failed to disclose, any facts or circumstances in any patent application that would constitute fraud or a misrepresentation with respect to such application or that would otherwise affect the validity or enforceability of any patent that issues from such application;

(n)    none of the Patents are subject to any proceeding, order or agreement that restricts the use, transfer, or licensing thereof by the Vendor or that may materially affect the validity or enforceability of the Patents after the completion of the transactions contemplated under this Agreement;

(o)    no infringement, misappropriation or similar claim relating to the Business or any of the Assets is pending or threatened against the Vendor or against any entity entitled to be indemnified by the Vendor with respect to such claim or proceeding;

(p)    substantially all of the Inventory is fit for the purposes of the Business and will remain so for not less than three years following the Closing Date excepting only that the Essence Olivenol Plus and the Easeflex Olivenol Plus expire in December, 2020 ; and

(q)    all information provided by the Vendor to the Purchaser, to members of the Purchaser and to representatives thereof, in respect of the Business and the Assets is true, accurate and complete as of the date hereof; without limiting the generality of the foregoing, such information includes all information relating to: (i) the financial condition of the Business, including the cost of the Inventory; (ii) the amount, condition and qualities of the Inventory; (iii) the timing, cost and effects of the proposed processing of the Inventory; (iv) the cost of and regulatory requirements relating to the distribution of the finished product; (v) the health effects of the finished product on human subjects; and, (vi) the regulatory requirements applicable thereto under all applicable laws.

## ARTICLE 4
### INDEMNITY

4.1    The Vendor shall indemnify and save harmless the Purchaser from any and all claims, demands, proceedings, losses, damages, liabilities, deficiencies, costs and expenses (including all legal and other professional fees and disbursements, interest, penalties and amounts paid in settlements) ("**Losses**") suffered or incurred by the Purchaser as a result of or arising directly or indirectly out

5/14

of or in connection with any breach or inaccuracy of any representation or warranty of the Vendor contained in this Agreement except to the extent that Purchaser has been or will be reimbursed for such claims, suits, loss, cost, expense, liability or damage by insurance. Purchaser waives any subrogation rights that Purchaser or its insurance may have to seek indemnification against Vendor for any payments made by Purchaser's insurance. The parties agree that Vendor's maximum indemnification limit is $1,500,000.

4.2     The Purchaser (the **"Indemnified Party"**) shall promptly give written notice to the Vendor (the **"Indemnifying Party"**) of any claim for indemnification pursuant this Article 4 (a **"Claim"**, which term shall include more than one Claim). The notice shall specify whether the Claim arises as a result of a claim by a person against the Indemnified Party (a **"Third Party Claim"**) or whether the Claim does not so arise (an **"Original Claim"**), and shall also specify with reasonable particularity (to the extent that the information is available):

(a)     the factual basis for the Claim with supporting documentation, as applicable; and

(b)     the amount of the Claim, or, if an amount is not then determinable, an approximate and reasonable estimate of the likely amount of the Claim.

If, through the fault of the Indemnified Party, the Indemnifying Party does not receive written notice of any Claim in time to contest effectively the determination of any liability susceptible of being contested, the Indemnifying Party shall be entitled to set off against the amount claimed by the Indemnified Party the amount of any Losses incurred by the Indemnifying Party as a result of the Indemnified Party's failure to give such notice on a timely basis.

4.3     With respect to an Original Claim, following receipt of written notice from the Indemnified Party of an Original Claim in accordance with section 4.2, above, the Indemnifying Party shall have thirty (30) days to make such investigation of that Original Claim as the Indemnifying Party considers necessary or desirable. For the purpose of such investigation, the Indemnified Party shall make available to the Indemnifying Party and its authorized representatives the information relied upon by the Indemnified Party to substantiate the Original Claim. If the Indemnified Party and the Indemnifying Party agree at or prior to the expiration of such thirty (30) day period (or any mutually agreed upon extension thereof) to the validity and amount of that Original Claim, the Indemnifying Party shall immediately pay to the Indemnified Party the full agreed upon amount of the Original Claim, failing which the matter may be litigated.

4.4     With respect to any Third Party Claim, the Indemnifying Party shall have the right, at its own expense, to participate in or assume control of the negotiation, settlement or defence of the Third Party Claim and, in such event, the Indemnifying Party shall reimburse the Indemnified Party for all the Indemnified Party's out-of-pocket expenses as a result of the participation or assumption. If the Indemnifying Party elects to assume such control, the Indemnified Party shall cooperate with the Indemnifying Party, shall have the right to participate in the negotiation, settlement or defence of the Third Party Claim at its own expense and shall have the right to disagree on reasonable grounds with the selection and retention of counsel. If the Indemnifying Party disagrees on reasonable grounds with the selection or retention of counsel, counsel satisfactory to the Indemnifying Party and the Indemnified Party shall be retained by the Indemnifying Party. If the Indemnifying Party, having elected to assume control thereafter fails to defend the Third Party Claim within a reasonable time then the Indemnified Party shall be entitled to assume control and the Indemnifying Party shall be bound by the results obtained by the Indemnified Party with respect to such Third Party Claim.

4.5     If a Third Party Claim is of such a nature that the Indemnified Party is required by applicable law to make a payment to any person (a **"Third Party"**) with respect to the Third Party Claim before the completion or settlement negotiations or related legal proceedings then the Indemnified Party may make such payment and the Indemnifying Party shall, forthwith, after demand by the Indemnified

6/12

Party, reimburse the Indemnified Party for such payment. If the amount of any liability of the Indemnified Party under the Third Party Claim in respect of which the payment was made is, as finally determined, less than the amount that was paid by the Indemnifying Party to the Indemnified Party, the Indemnified Party shall, forthwith after receipt of the difference from the Third Party, pay the amount of such difference to the Indemnifying Party.

4.6 If the Indemnifying Party fails to assume control of the defence of any Third Party Claim then the Indemnified Party shall have the exclusive right to contest, settle or pay the amount claimed. Whether or not the Indemnifying Party assumes control of the negotiation, settlement or defence of any Third Party Claim, the Indemnifying Party shall not settle any Third Party Claim without the written consent of the Indemnified Party, which consent shall not be unreasonably withheld or delayed; provided, however, that the liability of the Indemnifying Party shall be limited to the proposed settlement amount if any such consent is not obtained for any reason.

4.7 The Indemnified Party and the Indemnifying Party shall cooperate fully with each other with respect to Third Party Claims and shall keep each other fully advised with respect thereto (including promptly supplying copies of all relevant documents as they become available).

4.8 *Deduction for Purchaser's Tax Benefits.* In computing the amount to be paid by Vendor under its indemnity obligations, there will be deducted an amount equal to any tax benefits actually received by Purchaser taking into account the income tax treatment of the receipt of these payments.

4.9 *Tax Treatment of Indemnification Payments.* Any indemnification payments made pursuant to this Article 4 shall be treated as an adjustment to the Purchase Price by the parties for tax purposes, unless otherwise required by Law.

## ARTICLE 5
## SALES TAX

5.1 On or before the Closing Date, Purchase shall furnish to Vendor a duly completed California Resale Certificate (Form CDTFA-230). Vendor and Purchaser shall ensure that their tax filings are consistent with the foregoing certificate. Purchaser represents and warrants to Vendor that it is purchasing the Inventory for resale purposes. Purchaser represents and warrants that it holds a valid California Resale Certificate issued by the State of California.

## ARTICLE 6
## GENERAL PROVISIONS

6.1 *Choice of Law.* This Agreement shall be governed by the laws of the State of California and the federal laws of the United States of America applicable therein, and the parties agree to the non-exclusive jurisdiction of the courts of the State of California.

6.2 *Currency.* All monetary amounts referred to herein shall refer to the lawful currency of the United States of America.

6.3 *Severability.* If any provision of this Agreement shall be held to be invalid, illegal or unenforceable, the validity, legality or enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

6.4 *Entire Agreement.* This Agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, between the parties with respect thereto.

6.5 *Time of the Essence.* Time shall be of the essence of this Agreement.

7/12

6.6     *Survival of Representations and Warranties*. The representations and warranties contained in Article 3 of this Agreement shall survive the closing of the purchase and sale of assets contemplated herein.

6.7     *Counterparts*. This Agreement may be executed in counterparts and by electronic transmission, each of which counterpart shall constitute an original and all of which taken together shall constitute one and the same instrument.

[*Signatures on next page*]

8/12

IN WITNESS WHEREOF the parties have duly executed this Agreement as of the date first written above.

Caliscana, LLC

_____
Roberto Crea, Member

_____
Roberto Crea, Individually

OLIPHENOL LLC,

_____
Raymond Chyc, Member

Raymond Chyc has duly executed this Agreement as of the date first written above exclusively for the purpose of acknowledging and accepting the terms and conditions set forth in subsections 2.3(a) and 2.6(a), above.

_____
RAYMOND CHYC

**Australia**

Patent no.    746712 (August 15, 2002*)

60230535 (August 9, 2007)

2003249719 (June 18, 2010)

2008249142 (August 16, 2012)

2006269843 (April 26, 2013)

**Canada**

Patent no.    2,420,893 (November 22, 2011)

2,474,798 (December 4, 2012)

**Europe**

Patent no.    1098573 (June 23, 2004)

1315691 (August 15, 2012)

1924269 (March 11, 2015)

**Greece**

Patent no.    3050066 (August 31, 2004)

**Mexico**

Patent no.    228306 (June 6, 2005)

**United States**

Patent

Application no.    6165475 (December 26, 2000)

6197308 (March 6, 2001)

6936287 (August 30, 2005)

7261909 (August 28, 2007)

7713569 (May 11, 2010)

8263142 (September 11, 2012)

9789149 (October 17, 2017)

Application no. 62442360 (filed on January 4, 2017)

62/448208 (filed on January 19, 2017)

*re*
*RC*

* All dates refer to the date of the grant unless otherwise specified.

**China**

Registration no.    19278735 (Hidrox)

**Europe**

Registration no.    014579783 (Hidrox)

**Japan**

Registration no.    5849226 (Hidrox)
                    5849225 (Olivenol)

**United States of America**

Registration no.    4123953 (Hidrox)

12/14

## Schedule 'C'
### (Inventory)

| | |
|---|---|
| Hidrox 0.5% Liquid | 750,000 litres |
| Hidrox 10X Liquid | 3,095 litres |
| Hidrox 12% Powder | 101 kgs |
| Hidrox 6% | 20 kgs |
| Essence Olivenol Plus | 8 24-packs |
| Easeflex Olivenol Plus | 1 24-pack |

13/12

## Schedule 'D'

### (Distribution Agreements)

1. Supply Agreement entered into between CreAgri, Inc. and Sunsweet Growers Inc. as of September 1, 2012

2. Distribution Agreement entered into between CreAgri, Inc. and Pharmachem S.A. DE C.V. as of August 8, 2013

3. Distributor Agreement entered into between CreAgri, Inc. and Eurochem Feinchemie GmbH as of January 2, 2014

4. Licensed Reseller Supply Agreement entered into between CreAgri, Inc. and H&S Solutions Limited as of May 1, 2014

5. Exclusive Distribution Agreement entered into between CreAgri, Inc. and Health Korea Inc. as of May 1, 2014

6. Representative Services Agreement entered into between CreAgri, Inc. and Mr. Makoto Takahashi as of August 1, 2014

7. Contract № 15-20/643-840 entered into between CreAgri, Inc. and Pharmstandard LLC as of April 20, 2015

8. Distribution Agreement entered into between CreAgri, Inc. and BU8 Sdn. Bhd as of December 30, 2016

9. OLIVENOL™ and OLIVENOL PLUS™ Distributor Agreement entered into between CreAgri, Inc. and Holistic Solutions, Ltd. as of August 17, 2017

10. Distributorship & License Agreement entered into between CreAgri, Inc. and AIDE Co., Ltd. as of May 1, 2018